Wendell ANTHONY, Joann Watson, individually and as President and Executive Director of the Detroit Branch of the NAACP, respectively, and the NAACP, Beulah Work, the Legal Aid and Defender Association, the National Bar Association and the National Conference of Black Lawyers, Plaintiffs,

v.

The State of MICHIGAN, Defendant.

No. 96–74626.

United States District Court, E.D. Michigan, Southern Division.

Feb. 16, 1999.

Melissa Z. El, Harold D. Pope, Detroit, MI, for Plaintiffs.

Denise C. Barton, Katherine C. Galvin, Assistant Attorneys General, Lansing, MI, for Defendant.

**OPINION AND ORDER**

COHN, District Judge.

### Table of Contents

I. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 991
II. Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 992
 A. The Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 992
 B. Wayne County Circuit Court . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 992
 C. Recorder's Court . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 993
 D. Relationship of Wayne County Circuit Court and Recorder's Court
 Prior to the Merger . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 993
 E. Funding of the Michigan Courts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 994
 F. The Merger . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 996

G. Effects of the Merger ..........................................997
H. Legislative Analysis ..........................................997
I. Other Challenges to the Merger ...............................998

III. **Election Analyses** ................................................999
A. Gingles ...................................................999
B. Pildes Report .............................................1000
C. Expert Reports.............................................1000
D. Findings...................................................1001

IV. **The Motion for Summary Judgment** ..................................1002
V. **Constitutional Claims** .............................................1002
A. Standing...................................................1002
B. Constitutional Arguments ..................................1003

VI. **Voting Rights Act** ...............................................1004
A. Incumbent Candidates.......................................1005
B. Non-incumbent Candidates...................................1005

VII. **Conclusion** .....................................................1006

## I. Introduction

This is a challenge to the merger of the Recorder's Court for the City of Detroit with Wayne County Circuit Court. Effective October 1, 1997, Recorder's Court was abolished and the judges of Recorder's Court became judges of Wayne County Circuit Court. *See* Mich. Comp. Laws Ann. § 600.9931. Plaintiffs claim that the merger violates their rights protected by the Fourteenth and Fifteenth Amendments to the United States Constitution because it was motivated by a racially discriminatory purpose, and that it violates § 2 of the Voting Rights Act, 42 U.S.C. § 1973, because the white majority in Wayne County voting as a bloc usually defeats the preferred candidates of the African–American voters in Wayne County Circuit Court elections.

Before the Court is defendant State of Michigan's motion for summary judgment. With respect to the constitutional claims, defendant argues that plaintiffs do not have standing to bring the claims because plaintiffs, as voters residing in the City of Detroit, have not established that they suffered an injury in fact as a result of the merger. Defendant alternatively argues that, even if plaintiffs have standing to sue, plaintiffs have not established that the two courts were merged due to a discriminatory purpose. With regard to the claim under the Voting Rights Act, defendant argues that plaintiffs have not established that the preferred candidates of the African–American community for the Wayne County Circuit bench are usually defeated by the white voting bloc in Wayne County. Thus, according to defendant, plaintiffs have not satisfied the third precondition required under *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), to bring such a claim.

Plaintiffs' constitutional claims will be dismissed. Plaintiffs base their claim of standing solely on the fact that they are registered voters residing in the City of Detroit. This fact alone, however, is insufficient to establish that plaintiffs have suffered a concrete and particularized injury in fact due to the merger. Plaintiffs claim of generalized harm cannot confer them standing. Nevertheless, even if plaintiffs had standing, the constitutional claims have serious shortcomings. Plaintiffs assert that the abolition of Recorder's Court will significantly reduce the number of African–American judges in Wayne County because African–American candidates must now run county-wide to be elected. Plaintiffs, however, offer no relevant evidence to indicate that the courts were merged because of this potentially discriminatory effect. Rather, the merger was part of a larger effort by the state to equitably fund its trial courts, which it had not done since legislation in 1980 resulted in a large subsidy from the state for only three of its trial courts: Wayne County Circuit Court, Recorder's Court, and 36th District Court.

In sum, the merger went forward in spite of the potentially adverse effects.

The claims under the Voting Rights Act also will be dismissed. To prevail under § 2 of the Voting Rights Act, plaintiffs must establish that preferred candidates of the African–American community are usually defeated by a white voting bloc. The parties furnished the Court with statistical analyses of the Wayne County Circuit Court races in general elections from 1986 to 1996. During this time period, eleven of eleven, or one-hundred percent, of the preferred incumbent candidates of the African–American community were elected to the Wayne County Circuit bench, and four of eight, or fifty percent, of the preferred non-incumbent candidates of the African–American community were elected. As a matter of law, these rates of success do not establish that the minority-preferred candidates are usually defeated.

Accordingly, for the reasons articulated in detail below, defendant's motion will be granted and this case will be dismissed.

## II. Background

### A. The Parties

The individual plaintiffs, Wendell Anthony, Joann Watson, and Beulah Work, are registered voters in the City of Detroit. Wendell Anthony also is the President of the Detroit Branch of the NAACP, and Joann Watson is its Executive Director. Plaintiffs National Association for the Advancement of Colored People (NAACP), National Conference of Black Lawyers (NCBL), National Bar Association (NBA), and the Legal Aid and De-

fender Association have members who are registered voters in the City of Detroit. Other than those noted above, the individual members of the organizational plaintiffs are not parties to this lawsuit. The defendant is the State of Michigan.[1]

### B. Wayne County Circuit Court

Article 6, Section 1 of the Michigan Constitution of 1963 states:

The judicial power of the state is vested exclusively in one court of justice which shall be divided into one supreme court, one court of appeals, one trial court of general jurisdiction known as the circuit court, one probate court, and courts of limited jurisdiction that the legislature may establish by a two-thirds vote of the members elected to and serving in each house.

Wayne County Circuit Court in its current incarnation was created by Article 6, Section 11 of the Michigan Constitution of 1963.[2] Under Article 6, Section 12 of the Michigan Constitution: "Circuit judges shall be nominated and elected at non-partisan elections in the circuit in which they reside, and shall hold office for a term of six years and until their successors are elected and qualified." In other words, Wayne County Circuit Court judges are elected at large in county-wide races by voters residing in Wayne County.[3] The elections are technically "non-partisan."

Prior to the merger, Wayne County Circuit Court had jurisdiction over civil matters with over $10,000 in controversy as well as all criminal felonies that occurred in Wayne County outside of the City of Detroit. Resi-

---

**1.** Because plaintiffs seek only injunctive relief, there are no Eleventh Amendment issues. *See Edelman v. Jordan,* 415 U.S. 651, 664, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).

**2.** Article 6, Section 11 provides:

The state shall be divided into judicial circuits along county lines in each of which there shall be elected one or more circuit judges as provided by law. Sessions of the circuit court shall be held at least four times in each year in every county organized for judicial purposes. Each circuit judge shall hold court in the county or counties within the circuit in which he is elected, and in other circuits as may be provided by rules of the supreme court. The number

of judges may be changed and circuits may be created, altered and discontinued by law and the number of judges shall be changed and circuits shall be created, altered and discontinued on recommendation of the supreme court to reflect changes in judicial activity. No change in the number of judges or alteration or discontinuance of a circuit shall have the effect of removing a judge from office during his term.

Wayne County Circuit Court is also known as the Third Judicial Circuit of Michigan.

**3.** *See generally* Mich. Comp. Laws Ann. §§ 168.411–426 (describing the qualifications, nomination, election, terms, and removal of circuit court judges).

dents of Wayne County comprise the jury pool for Wayne County Circuit Court. Immediately prior to the merger, Wayne County Circuit Court consisted of thirty-five judges: twenty-eight whites and seven African Americans.

### C. Recorder's Court

Recorder's Court originated as the result of a merger: the Detroit Mayor's Court, the Police Court of 1850, and the criminal jurisdiction of Wayne County Circuit Court were consolidated into the Recorder's Court for the City of Detroit by the Charter of the City of Detroit in 1857. Historically, the jurisdiction of Recorder's Court was limited to felonies occurring in the City of Detroit. Judges of the Recorder's Court were elected by voters of the City of Detroit, and residents of the City of Detroit constituted the jury pool for Recorder's Court. Immediately prior to the merger, Recorder's Court consisted of twenty-nine judges: twenty-two African Americans, one Hispanic, and six whites as of 1997.

Recorder's Court was an anachronism. Although technically a municipal court, Recorder's Court essentially functioned as a circuit court. Recorder's Court was the only municipal court in the state that handled criminal felonies, making it vastly different than the other municipal courts in the state, which generally handle traffic and ordinance violations. Further, Recorder's Court was the only municipal court that was funded by the state. Wayne County, therefore, was the only county in the state that effectively had two circuit courts prior to the merger: Recorder's Court handled most of the criminal felony cases occurring in Wayne County, and Wayne County Circuit Court primarily handled civil cases.

### D. Relationship of Wayne County Circuit Court and Recorder's Court Prior to the Merger

The prospect of merging Wayne County Circuit Court with Recorder's Court has been a topic of debate since the late 1970s. During this time period, Governor William Milliken called for "reorganization of the Third (Wayne County) Judicial Circuit and the circuit-court-related portion of Recorder's Court into a single functioning entity." [4] In 1979, the Detroit Association of Black Organizations (DABO) examined Governor Milliken's merger proposal to determine whether the merger should be supported by the black community. The DABO noted:

As this inquiry got underway, it soon became most apparent that if the intrinsic interests of the black community were to be served in the resolution of this issue, it would be imperative that we separate out fact from supposition or fancy, however well-intentioned. The Steering Committee, therefore, in seeking to properly execute its responsibilities under the DABO House of Delegates' charge, has unremittingly sought to elicit the hard facts; hence, if the facts did not support a contention or allegation, the contention or allegation was given little or no weight.

It is in this vein that we report, in the very outset, that at no time during the many, many hours of debate and testimony from a wide range of experts on this question was any credible evidence presented, whatsoever, that would support the anti-black conspiracy theory: "Its simply a move (Wayne County Court Reorganization) to deprive blacks of their hardearned gains in the Detroit courts." Now, please note carefully, we are not saying an anti-black conspiracy does not exist. "All we are saying is the facts to support it were never disclosed—though we zealously sought them—and that the stakes for the black community are far too high for its decision in this matter to be based on what seems to be, rather than what is[.]" [5]

Various actions beginning in 1980 slightly blurred the line between Recorder's Court and Wayne County Circuit Court. As will be explained in detail below, in 1980 the state assumed the funding responsibilities for

---

4. *See Letter from Governor Milliken to Basil Brown, Chairman of the Senate Judiciary Committee, and Dennis Hertel, Co–Chairman of the House Judiciary Committee, dated February 13, 1980* (defendant's Exhibit F).

5. *Letter from Horace Sheffield, Vice President of DABO, to Governor Milliken, dated August 29, 1979* (defendant's Exhibit G).

many of the operational expenses of Wayne County Circuit Court, Recorder's Court, and the 36th District Court, and their employees, other than the judges, became employees of the State Judicial Council. Wayne County Circuit Court also administratively merged with Recorder's Court in 1981.

Further, on October 2, 1986, the Michigan Supreme Court consolidated the criminal dockets of Wayne County Circuit Court and Recorder's Court pursuant to Administrative Order 1986–1, which stated in part:

> On order of the Court, the Court having approved a joint local court rule and a joint local administrative order consolidating the criminal dockets of the Third Judicial Circuit and the Recorder's Court of the City of Detroit,
>
> IT IS ORDERED pursuant to Const 1963, art 6, §§ 1, 4, 5, and 23, that, effective October 13, 1986, all judges of the Third Judicial Circuit be temporarily assigned as visiting judges of the Recorder's Court of the City of Detroit and that all judges of the Recorder's Court of the city of Detroit be temporarily assigned as visiting judges of the Third Judicial Circuit.
>
> Further, acknowledging MCR 8.110(G)(3) and M.C.L.A. § 600.564(4); MSA 27A.564(4), IT IS ORDERED that the visiting judges temporarily assigned pursuant to this administrative order shall exercise the powers of the court to which they are assigned; provided, however, that they shall exercise those powers only in cases assigned to them pursuant to the joint local administrative order and joint local court rules consolidating the criminal dockets of the Third Judicial Circuit and the Recorder's Court of the City of Detroit.

*See* 426 Mich. lxviii (1986). Under Administrative Order 1986–1, all Wayne County felony cases were tried in Recorder's Court, and five of the thirty-five Wayne County Circuit Judges rotated every three months to hear felony cases in Recorder's Court. The jury structure, however, remained the same: a defendant charged with a crime in Detroit faced jurors from Detroit, and a defendant charged with a crime outside Detroit faced jurors from the entire Wayne County area. Administrative Order 1986–1 was rescinded pursuant to Supreme Court Administrative Order 1995–5, effective October 10, 1995. *See* 450 Mich. cxxii (1995).

### E. Funding of the Michigan Courts

The Michigan Supreme Court has observed that "[t]here is no public environment in the state of Michigan more complex than the trial court component of the state's 'one court of justice.'" *Judicial Attorneys Ass'n v. State of Michigan,* 459 Mich. 291, 298, 586 N.W.2d 894 (1998). This complexity stems at least in part from the battle over the funding of Michigan's trial courts since the 1980s. An historical overview as to how Michigan's trial courts have been funded over the years is therefore necessary to place the merger in context. "Upon this point a page of history is worth a volume of logic." *New York Trust Co. v. Eisner,* 256 U.S. 345, 349, 41 S.Ct. 506, 65 L.Ed. 963 (1921) (Holmes, J.).

It is important to distinguish initially between funding for judges' salaries and funding for operational expenses of the courts. Judges' salaries have primarily been funded by the state since 1980. In contrast, local funding units, such as the counties, cities, townships, and villages, historically paid the operational expenses of the courts situated within their geographical limits.

Public Acts 438 through 442 of 1980 created a limited exception to the rule of local funding for operational expenses by providing state funding for a substantial portion of the operational expenses of Wayne County Circuit Court, Recorder's Court, and 36th District Court in Detroit.[6] This exception,

---

6. The reasons for the 1980 legislation have been articulated as follows:

> The need for state government to streamline the operations and assume the costs of the state's judicial system has been recognized for some time now. The increase in case backlogs throughout the state and the lessened ability of local units of government to meet the costs of

court operation point toward the desirability of such an approach. However, nowhere is the need for court reorganization and state assumption of the costs of court operations more urgent than in the Detroit–Wayne County area. The existence of several different court establishments has led to inefficiency in the administration of justice and duplication in court

however, was intended to be temporary because Public Act 438 of 1980 also set the following timetable under which the state aspired to fully fund all of its trial courts by 1988:

> The legislature shall appropriate sufficient funds in order to fund:
>
> (a) At least 20% of all court operational expenses in the state fiscal year beginning October 1, 1983.
>
> (b) At least 40% of all court operational expenses in the state fiscal year beginning October 1, 1984.
>
> (c) At least 60% of all court operational expenses in the state fiscal year beginning October 1, 1985.
>
> (d) At least 80% of all court operational expenses in the state fiscal year beginning October 1, 1986.
>
> (e) At least 100% of all court operational expenses in the state fiscal year beginning October 1, 1988.

The Act also provided that if the timetable was not followed, other funding under the statute—i.e., funding for Wayne County Circuit Court, Recorder's Court, and 36th District Court—would terminate.[7]

Both the governor and the legislature balked at the timetable. The governor did not include funding for the operational expenses of the out-state courts in the budget or general appropriations bills, and the legislature did not pass an appropriations bill in this regard. See Grand Traverse County v. State of Michigan, 450 Mich. 457, 461, 538 N.W.2d 1 (1995). Nevertheless, the state continued to fund Wayne County Circuit Court, Recorder's Court, and the 36th District Court. Thus the upshot of Public Acts 438 through 442 of 1980: Wayne County Circuit Court, Recorder's Court, and the 36th District Court received a large subsidy from the state, while the rest of the trial courts received very limited funding from the state.[8]

As a result, in 1988, seventy-six counties, forty-six cities, eleven townships, and one village filed a class action against the state claiming, among other things, that the state violated its obligation under Public Act 438 of 1980 to fund trial-court operational expenses.[9] See Grand Traverse County, 450 Mich. at 461, 538 N.W.2d 1. The plaintiffs sought a money judgment reimbursing them for expenses paid in 1986. The case went to the Michigan Supreme Court, which rejected the plaintiffs claim for a money judgment on the grounds that a plain reading of the statute precluded a private cause of action as a

---

services and functions, as well as redundancy in the taxation of city and county residents. At the same time, the financial straits in which Wayne County finds itself make it increasingly difficult for the county to sufficiently fund its share of court operations. To address these problems, some feel that the courts in Detroit and Wayne County should be reorganized with the help of much-needed state funding, to improve the efficiency of these courts in this area and bring the court structure more into line with the rest of the state. Moreover, they see such a move as serving as a first step toward total state funding for the operations of all state courts in Michigan.

Susan Ekstrom, Court Organization and Funding in Michigan (July 1996), at pp. 2–3 (quoting a House Legislative Analysis Section analysis of Senate Bill 1106, which became Public Act 438 of 1980, dated September 22, 1980) (plaintiffs' Exhibit F). Ms. Ekstrom's paper is a publication of the House Legislative Analysis Section.

7. This section, formerly Mich. Comp. Laws Ann. § 600.9947(2), read:

> If the legislature does not appropriate sufficient funds to comply with subsection (1) for any fiscal year, the funds which are necessary for the continued implementation of sections 304, 555, 563, 564, 592, 593, 594, 595, 821, 8121a, 8202, 8272, 8273, 8275, 9104, 9943, and sections 13, 31, 32, 34, and 35 of Act No. 369 of the Public Acts of 1919, as amended, being sections 725.13, 725.31, 725.32, 725.34, and 725.35 of the Michigan Compiled Laws, shall terminate on September 30 of the fiscal year immediately preceding the fiscal year for which sufficient funds have not been appropriated.

8. Although the state fully funded the salaries of the employees of Wayne County Circuit Court, Recorder's Court, and 36th District Court, the state did not fund all of the expenses of these courts. Further, the other trial courts in the state did receive limited funding from the state for operational expenses.

9. The plaintiffs also claimed that the state had a duty under various provisions of the Michigan Constitution of 1963, including Article 6, Section 1, to fund the operational expenses of the trial courts. The Michigan Supreme Court rejected these arguments. See Grand Traverse County, 450 Mich. at 469–477, 538 N.W.2d 1.

remedy for the state's failure to follow the statute. *Id.* at 466, 538 N.W.2d 1. The supreme court opined that the only remedy provided under the statute was termination of all funding for trial court operational expenses, even though the legislature did not do so.[10]

The Michigan Supreme Court also noted that the wording of the statute at issue reflected that it was the result of a compromise in the legislature. *Id.* As such, "[t]he funding of Michigan trial courts has proven to be a difficult task because of the diverse interests at stake in each locality." *Id.* The supreme court concluded its opinion in *Grand Traverse County* with the following admonition:

> Until the Legislature, the counties, and the courts arrive at a plan for more efficient and effective court funding, difficulties like that presented in this case will arise. Indeed, the numerous cases addressing conflicts about court funding, and the controversy surrounding the instant case, demonstrate the need for continuing efforts by the judicial, legislative, and executive branches to reform the state's system of court funding.

*Id.* at 478, 538 N.W.2d 1.[11]

### F. The Merger

Public Act 374 of 1996 merged Recorder's Court with Wayne County Circuit Court and created a new system for state funding of the trial courts. Effective October 1, 1997, Recorder's Court and Wayne County Circuit Court merged pursuant to the following provision:

> The recorder's court of the city of Detroit is abolished and merged with the third judicial circuit of the circuit court effective October 1, 1997. The incumbent judges of the recorder's court of the city of Detroit

on September 30, 1997 shall become judges of the third judicial circuit of the circuit court on October 1, 1997, and shall serve as circuit judges until January 1 of the year in which their terms as judges of the recorder's court of the city of Detroit would normally have expired. Effective October 1, 1997, each incumbent judge of the recorder's court of the city of Detroit who was appointed to that office by the governor after the filing deadline for the August primary preceding the general election of 1996 shall become a judge of the third circuit of the circuit court and shall serve as a circuit judge until January 1 next succeeding the first general election held after the vacancy to which he or she was appointed occurs, at which election a successor shall be elected for the remainder of the unexpired term which the predecessor incumbent of the recorder's court would have served had that incumbent remained in office until his or her term would normally have expired. In seeking election to the third circuit of the circuit court after October 1, 1997, a judge of the recorder's court becoming a judge of the third circuit of the circuit court pursuant to this subsection may file an affidavit of candidacy in like manner as other incumbent judges of the circuit court, and shall be entitled to designation on the ballot as a judge of the circuit court.

Mich. Comp. Laws Ann. § 600.9931(1).

With respect to funding, the Act provides that every county is to receive funding for its trial courts under a new formula based on the caseload of each county, and that trial judges' salaries are to be paid in full by the state. The Act also created a "hold harmless" fund for five years, which is to be used to make payments to the counties or cities that receive less under the new funding for-

---

**10.** "While we readily concede that this remedy was not sought or implemented and that the Legislature thus failed to follow through on its announced intention, that does not change the status of a private cause of action for money judgment—the remedy provision clearly indicates an intent to preclude an action for money damages." *Grand Traverse County,* 450 Mich. at 466, 538 N.W.2d 1 (footnote omitted).

**11.** In Public Act 189 of 1993, the state committed to fund 31.5 percent of the trial court expenses of the entire state. The commitment of funds, however, was offset by the court revenues collected by the county or district control unit, among other things. As such, only twenty-four of the state's eighty-two other counties received funds under this provision. *See* Susan Ekstrom, *Court Organization and Funding in Michigan* (July 1996), at p. 5.

mula than they received from the state in fiscal year 1995–96. *See* Mich. Comp. Laws Ann. §§ 600.151a, 600.151b.

In anticipation of challenges to Public Act 374 of 1996, the legislature gave the county board of commissioners authority to create election districts if the merger violates the Voting Rights Act. Under Mich. Comp. Laws Ann. § 600.9948:

> If the state constitution of 1963 permits the creation of election districts in a county for countywide judicial office, or if, by a final nonreviewable judgment, a court determines that the federal voting rights act requires election districts rather than at-large election for countywide judicial office, the county board of commissioners has authority to create election districts to conform with those requirements.

### G. Effects of the Merger

Because the incumbent judges of the Recorder's Court became Wayne County Circuit judges, Wayne County Circuit Court consisted of sixty-four judges immediately after the merger: thirty-six whites, twenty-eight African Americans, and one Hispanic.[12] The former Recorder's Court judges became Wayne County Circuit judges until the first of January of the year in which their term on the Recorder's Court would have expired. Other than the number of seats available, the rules and qualifications for the postmerger

elections for Wayne County Circuit Court are identical.

As a result of the merger, the former Recorder's Court judges must run in county-wide races to be reelected. Plaintiffs assert that it will be difficult for African–American candidates for Wayne County Circuit Court to be elected due to the demographics of the county. According to the 1990 census, Wayne County had a population of 2,111,687, comprised of fifty-seven percent whites and forty percent African Americans. Of the 849,109 African Americans who lived in Wayne County, almost ninety-two percent lived in the City of Detroit.[13] The 1990 census also revealed that the total voting age population in Wayne County was 1,541,050, and the total African–American voting age population was 579,871, or thirty-six percent of the total voting age population in Wayne County.

### H. Legislative Analysis

Plaintiffs proffer of proof to support the claim of intentional discrimination[14] is limited to a legislative analysis of House Bill 5158,[15] which became Public Act 374 of 1996. The analysis was prepared by the House Legislative Analysis Section, which is comprised of "nonpartisan House staff," and the analysis indicates it is "for use by House members in their deliberations."[16] The analysis, dated July 29, 1996, contains several arguments "for" and "against" the bill. Plaintiffs cite some of these arguments as

---

**12.** Neither side has proffered the results of the 1998 election, and their experts' analyses were not revised after the 1998 election. Thus, the parties apparently agree to having this case decided without the 1998 election results as part of the record.

**13.** As stated in the 1990 census, the City of Detroit had a population of 1,027,974, of which seventy-six percent were African American and twenty-two percent were white.

**14.** In a letter dated August 13, 1998, the Court instructed plaintiffs "to identify the papers, or portions thereof, which articulate their constitutional claim(s) as distinguished from their claim under the Voting Rights Act" because it was unclear from the papers "precisely where and to what extent plaintiffs' constitutional claim(s) are articulated." In response plaintiffs submitted a letter citing to portions of the record that they say supports their constitutional claims. Specifically, plaintiffs cite to a deposition of a state

senator as well as excerpts from the *Journal of the Senate* in which statements of individual state senators regarding the merger are compiled. Ostensibly, plaintiffs are inviting the Court to review the motives of the individual legislators in voting for the legislation. "But a judiciary must judge by results, not by the varied factors which may have determined legislators' votes. We cannot undertake a search for motive in testing constitutionality." *Daniel v. Family Sec. Life Ins. Co.*, 336 U.S. 220, 224, 69 S.Ct. 550, 93 L.Ed. 632 (1949). Accordingly, the Court declines plaintiffs' invitation.

**15.** *See* plaintiffs' Exhibit H (hereinafter referred to as *Legislative Analysis*).

**16.** The *Legislative Analysis*, however, "does not constitute an official statement of legislative intent."

evidence that the legislation was passed because of the discriminatory effects on African–Americans.

An argument for the bill was that it would correct the inequity in the state providing special funding to Wayne County Circuit Court, Recorder's Court, and 36th District Court, because the bill would provide state funding for all trial courts under a formula based on their caseloads. Although the merger was part of the bill, the analysis indicates that "the bill actually is not a court reorganization bill but rather a court funding bill." [17] Another argument for the bill was that it would standardize the state court system. Prior to the merger, Wayne County was an anomaly among the circuit courts in that its jurisdiction was divided between two courts, with Recorder's Court handling most of the criminal felonies and Wayne County Circuit Court handling primarily civil and divorce cases. The bill would therefore unite the criminal and civil cases in one court, bringing Wayne County in line with the state's other counties.[18]

Further, the analysis notes that the number of African–American judges and the jury pool would be diluted because judges would run county-wide, and jurors would be drawn from the entire county rather than just the City of Detroit. Several arguments "for" and "against" the bill stem from this aspect of the merger. First, the judges trying criminal felony cases would be accountable to all voters in Wayne County. Second, the merger would ensure "an equal opportunity for justice in Wayne County." According to the analysis, critics of Recorder's Court argued that Recorder's Court judges and juries were either too lenient or too harsh on defendants in some high-profile cases involving victims and defendants of different races.[19] Third, the number of African–American judges in the county would potentially be reduced due to the demographics of Wayne County. Former judges of the Recorder's Court had an almost eighty-percent African–American electoral base; in contrast, Wayne County has a forty-percent African–American electorate. Presumably, it will be more difficult to elect African–Americans in the county-wide races.

## I. Other Challenges to the Merger

There has been other litigation in connection with the merger raising various issues, none of which are determinative here. The following cases have been decided in the Michigan courts: *Kuhn v. Secretary of State*, 228 Mich.App. 319, 579 N.W.2d 101 (1998), *leave to appeal denied*, 457 Mich. 884, 586 N.W.2d 926 (1998), in which a group of plaintiffs, including Oakland County Circuit Judge Richard Kuhn, unsuccessfully challenged the merger on the grounds that "the transfer of judges from a legislatively created court, the Recorder's Court, to a constitutionally created court, the Wayne Circuit Court, violates [Mich.] Const.1963, art. 6, §§ 1 and 11, and that art. 6, § 23 is violated because new

---

**17.** *Legislative Analysis* at 20.

**18.** The analysis also responds to this argument:

> The bill would abolish the Detroit Recorder's Court ... apparently simply on the grounds of "standardization." ... [S]ome people question ... the "standardization" argument, pointing out that the bill would eliminate only one "special court"—the predominantly African American recorder's court—and would leave in its place the existing suburban—and overwhelmingly white—municipal courts in Grosse Pointe, Grosse Pointe Farms, Grosse Pointe Park, Grosse Pointe Shores, Grosse Pointe Woods, and Eastpointe.... So if recorder's court is to be eliminated in the interests of "standardization," why doesn't the bill propose these municipal courts' elimination as well? Some people believe that the difference in the bill's treatment of these courts is racially based: they point out that the majority of re-

corder's court judges are African American (currently, 22 of the 29 judges), as is the jury pool for the court drawn from the City of Detroit, while none of the suburban municipal judges is African American and their jury pools are overwhelmingly white. In addition, some people point out that recorder's court has operated as a unique and separate court for over 150 years, and that no one proposed eliminating the court when its racial makeup was predominantly white and served a predominantly white population.

> *Legislative Analysis* at 19.

**19.** "In particular, as a May 1996 *Detroit Free Press* article suggests, the move to abolish Detroit Recorder's court 'appears to partake of an element of payback for the conviction in Recorder's Court of [white] former Detroit police officers Walter Budzyn and Larry Nevers for the murder of [black Detroiter] Malice Green.'" *Legislative Analysis* at 19.

judgeships in the Wayne Circuit Court must be filled by election," *id.* at 323, 579 N.W.2d 101; *Judicial Attorneys Ass'n v. State of Michigan,* 459 Mich. 291, 586 N.W.2d 894 (1998), where the provision of Public Act 374 of 1996 in which Wayne County Circuit Court personnel became employees of a either the county or county judicial council rather than the State Judicial Council was found to violate the separation of powers clause, art. 3, § 2 of the Michigan Constitution of 1963; and *Mayor of Detroit v. State of Michigan,* 228 Mich.App. 386, 579 N.W.2d 378 (1998), *leave to appeal granted,* 457 Mich. 882, 586 N.W.2d 925 (1998), where the Michigan Court of Appeals held that Public Act 374 of 1996 does not violate the Headlee Amendment, art. 9, § 29 of the Michigan Constitution of 1963.

This Court has previously dismissed two cases filed as challenges to the merger. The Court dismissed *Williams v. State of Michigan,* No. 97–75103, filed by two individuals proceeding *pro se,* for failure to comply with pleading requirements. In *Kuhn v. Miller,* No. 98–70771, Oakland County Circuit Judge Richard Kuhn, among others, once again challenged the merger. The plaintiffs argued that the transfer of the Recorder's Court judges to the Wayne County Circuit Court violated the "one person, one vote" doctrine because an effect of the merger was that voters residing in the City of Detroit alone elected twenty-nine of the Wayne County Circuit judges. The Court granted the defendant's motion to dismiss on the grounds that the "one person, one vote" doctrine is inapplicable in this context. *See, e.g., Wells v. Edwards,* 347 F.Supp. 453 (M.D.La. 1972), *summarily aff'd,* 409 U.S. 1095, 93 S.Ct. 904, 34 L.Ed.2d 679 (1973). The decisions in *Williams* and *Kuhn* were appealed and are now pending before the Court of Appeals for the Sixth Circuit.

### III. Election Analyses

Plaintiffs claim the merger violates Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, which provides:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

Section 2 of the Voting Rights Act applies to judicial elections. *See Chisom v. Roemer,* 501 U.S. 380, 395–96, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991).

In support of their contentions regarding whether the merger violates § 2, the parties proffer analyses of expert witnesses that purport to demonstrate the voting behavior of registered voters in Wayne County. The analyses are based on data garnered from the voting results in Wayne County Circuit Court races in general elections from 1986 to 1996.[20] To place the analyses in context, a brief overview of *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), is pertinent.

#### A. *Gingles*

In *Gingles,* the Supreme Court enunciated the "necessary preconditions for multimem-

---

**20.** Apparently racial composition data for election precincts in Wayne County is not available for elections prior to 1986.

ber districts to operate to impair minority voters' ability to elect representatives of their choice." *Id.* at 50, 106 S.Ct. 2752. The three preconditions are:

- "First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district."
- "Second, the minority group must be able to show that it is politically cohesive."
- "Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it ... usually to defeat the minority's preferred candidate."

*Id.* at 50–51, 106 S.Ct. 2752. Plaintiffs must prove the existence of the preconditions before the Court considers the "totality of the circumstances" to determine whether § 2 is violated. If the preconditions are not satisfied, the claim under § 2 of the Voting Rights Act fails. *See, e.g., Cousin v. McWherter,* 46 F.3d 568, 573 (6th Cir.1995); *Gingles,* 478 U.S. at 42–46, 106 S.Ct. 2752.

The parties agree that the first precondition is satisfied: the African–American population is sufficiently large and geographically compact to constitute a single-member district. In fact, over ninety percent of the African Americans in Wayne County live within a legally and politically defined jurisdiction: the City of Detroit. It is the second and third preconditions, as stated by the Court of Appeals for the Sixth Circuit, that "require a court to consider the voting behavior of different races." *Cousin v. Sundquist,* 145 F.3d 818, 823 (6th Cir.1998).

### B. Pildes Report

In an Order dated April 3, 1998, the Court appointed Richard Pildes, Professor of Law at the University of Michigan, to serve as an independent expert pursuant to Fed.R.Evid. 706. The Court directed Professor Pildes to consider the evidence proffered to indicate the voting behavior of the different races, including the reports of the parties' experts. Particularly, the Court instructed Professor Pildes to "express an opinion in the form of a written report as to whether there is a genuine issue as to any material fact with respect

to the plaintiffs' claim that the merger of the Recorder's Court and the Wayne County Circuit Court, and the resulting at-large election of judges to the Circuit Court of Wayne County, violates Section 2 of the Voting Rights Act, 42 U.S.C. § 1973." [21]

Professor Pildes lodged an extensive report and a summary of the report with the Court (Pildes Report). Professor Pildes concluded:

- Every African–American judicial candidate who ran in general elections but one was a "candidate of choice" of the African–American community.
- With respect to incumbent African–American judicial candidates in general elections, voting was not racially polarized to a level of legal significance.
- With respect to non-incumbent judicial candidates in general elections, "plaintiffs have not established that voting is racially polarized in the legally significant sense. Minority-preferred judicial candidates are not 'generally' or 'usually' or 'normally' defeated within the legal meaning of those terms."

### C. Expert Reports

Plaintiffs proffered a report of Dr. Wilbur Rich (Dr. Rich), a professor of political science at Wellesley College and a former professor of political science at Wayne State University. Dr. Rich represents that he has studied Detroit politics for some seventeen years. Among other things, Dr. Rich opines in his report:

Given the possibility of increased white polarized voting and the dilution of black voting strength, it would be a mistake to abolish the Detroit Recorder's Court. The merger with Wayne County Circuit Court will afford black residents of Detroit less opportunity than their suburban white counterparts to elect judges of their choice. It is a delusionary mechanism designed to discriminate against the black residents of Detroit.

Dr. Rich concludes: "I believe the consolidation of Recorder's Court with Wayne County

---

**21.** Professor Pildes was not instructed to address plaintiffs' constitutional claims.

Circuit Court will dilute the voting strength of the residents of Detroit."

Dr. Rich's report is insightful. From plaintiffs' perspective, however, Dr. Rich's report is problematic in that it is not tailored to the *Gingles* preconditions. In particular, Dr. Rich, a self-described "qualitative political scientist" who conducted much of his research "based on interviews, observations and archival materials," does not provide a statistical analysis of election results. He does not identify candidates of choice in the African–American community and does not provide an analysis of whether voting patterns are racially polarized in specific elections. In short, Dr. Rich's report does not materially assist plaintiffs in opposing the state's motion for summary judgment.

Unlike Dr. Rich's report, the reports of plaintiffs' expert Dr. Diane Brown (Dr. Brown) and defendant's expert Dr. Harold Stanley (Dr. Stanley) analyzed election-result data and addressed the *Gingles* factors. As noted in the Pildes Report, however, there are several problems with their analyses, ranging from the statistical methods used to questionable interpretations of the Voting Rights Act.

Moreover, it is important to point out that Dr. Brown did not establish which candidates were the preferred candidates of the African–American community. Dr. Brown assumed that the African–American candidates were the preferred candidates in the African–American community. This is improper as a matter of law. "The proper inquiry is not whether white candidates do or do not usually defeat black candidates, but whether minority-preferred candidates, whatever their race, usually lose." *Sundquist*, 145 F.3d at 825. Professor Pildes noted that "[d]etermining who the candidates of choice of the black community are requires specific analysis."

Although plaintiffs have not provided the Court with the relevant data regarding the candidates of choice, Professor Pildes opined, using Dr. Stanley's data, that "[b]ased on statistical analyses of voting patterns in the

record, every black judicial candidate who ran in the general elections but one [between 1986 and 1996] meets the standard and should be considered a candidate of choice." For purposes of the motion for summary judgment, the Court makes an inference in plaintiffs' favor that all of the African–American judicial candidates who ran in the general elections were the candidates of choice of the African–American community.

### D. Findings

Despite the problems with the reports of Dr. Brown and Dr. Stanley, Professor Pildes scrutinized the relevant data and constructed several tables highlighting "what the data reveal about candidates of choice among the black community and the extent of legally significant white bloc voting."[22] Neither plaintiffs nor defendant objected to Professor Pildes' analysis; plaintiffs observe that "the evidence used by Pildes from Dr. Stanley[ ] reached essentially the same result as Dr. Brown." Given the absence of objections, the Court adopts Professor Pildes's analysis of the election-result data in all respects, and his conclusions in this regard are adopted as the Court's findings.[23] In particular:

1. *Candidates of Choice of the African–American Community.* From 1986 to 1996, each African–American judicial candidate for the Wayne County Circuit Court elections but one can be considered the candidate of choice of the African–American community.

2. *Polarized Voting.* Voting was polarized in the elections for the Wayne County Circuit bench. The white electorate often had markedly different voting preferences than the black electorate. For example, in the 1996 general election on the incumbent ballot, nineteen candidates vied for twelve judgeships. The African–American candidates who were the candidates of choice of the African–American community ranked second, fourth, fifth, and seventh within the African–American electorate. In contrast, the white electorate ranked the same candidates seventh, ninth, sixteenth, and nineteenth (last).

---

**22.** The tables are attached as an appendix to this opinion.

**23.** The relevant portions of the Pildes Report in this regard are incorporated by reference.

3. *Success of Incumbent Candidates of Choice of the African–American Community.* Making all reasonable inferences in favor of plaintiffs, the Court will accept Dr. Brown's classifications in this regard. As such, eleven of eleven incumbent African–American candidates who were candidates of choice of the African–American community were successfully elected. Success rate: 100%.[24]

4. *Success of Non–Incumbent Candidates of Choice of the African–American Community.* Making all reasonable inferences in favor of plaintiffs, the Court will accept Dr. Brown's classifications in this regard. Accordingly, four of eight candidates of choice of the African–American community were successfully elected.[25] Success rate: 50%.[26]

## IV. The Motion for Summary Judgment

With respect to the constitutional claims, defendant argues that plaintiffs do not have standing, and plaintiffs have not established a genuine issue over a material fact as to whether the two courts were merged due to a discriminatory purpose. With regard to the claims under the Voting Rights Act, defendant argues, among other things, that plaintiffs have not satisfied the *Gingles* preconditions. Plaintiffs oppose the motion on the grounds that genuine issues of material fact preclude summary judgment. Plaintiffs also assert that they have satisfied the *Gingles* preconditions.

 "Whether an electoral system has diluted the voting power of a minority group is a factual question, as is whether such a system was adopted with racially discriminatory intent." *Clarke v. Cincinnati,* 40 F.3d 807, 810 (6th Cir.1994). Nonetheless, summary judgment will be granted when the moving party demonstrates that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). There is

no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *In re Dollar Corp.,* 25 F.3d 1320, 1323 (6th Cir.1994) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). In so doing, the Court views the evidence in the light most favorable to plaintiffs. *See Employers Ins. of Wausau v. Petroleum Specialties, Inc.,* 69 F.3d 98, 101 (6th Cir.1995).

## V. Constitutional Claims

### A. Standing

 Defendants argue that plaintiffs do not have standing to bring the constitutional claims. The individual plaintiffs must satisfy three elements to have standing:

First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (citations omitted). The organizational plaintiffs—NAACP, NCBL, NBA and Legal Aid Defender Association—must demonstrate:

---

24. Dr. Stanley concluded that thirteen of fifteen African–American candidates of choice were successfully elected.

25. Dr. Brown considered Isabel Torres, an Hispanic candidate, a candidate of choice.

26. Dr. Stanley concluded that two of three candidates of choice of the African–American community were successfully elected.

(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Hunt v. Washington Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). To establish that they have standing at this stage of the litigation, both the individual and organizational plaintiffs must at a minimum make out a question of material fact as to each element. *See Lujan,* 504 U.S. at 561, 112 S.Ct. 2130 ("Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation.").

▪ In a conclusory fashion, plaintiffs state that they "base their claim of standing on the assertion that they or their members are registered voters in Detroit and are aggrieved on account of their race or the race of their members" due to the merger. In response to defendant's motion for summary judgment, plaintiffs argue that the purported racial impetus for the merger in and of itself confers them standing. According to plaintiffs, "[s]aying that there is a constitutional violation, but that there is no relief, is absurd and cannot prevail in this case."

Plaintiffs do not articulate how they are *particularly* harmed as a result of the merger, and the record is devoid of evidence of a concrete and particularized injury to either the individual or organizational plaintiffs. Though plaintiffs are or have members that are registered voters residing in the City of Detroit, plaintiffs proffer no evidence that any of them ran unsuccessfully for the Wayne County Circuit Court in any past election, plan to run for the Wayne County Circuit Court in any future election, have a criminal jury trial pending in Wayne County Circuit Court, or even that they have supported an unsuccessful candidate for the Wayne County Circuit Court in the past. Further, neither the individual nor the orga-

nizational plaintiffs seem to be the object of the government action. *See Lujan,* 504 U.S. at 562, 112 S.Ct. 2130 ("when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish") (quoting *Allen v. Wright,* 468 U.S. 737, 758, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)). Rather, the legislation plaintiffs challenge is arguably an attempt to keep African–American judges off the bench and an effort to dilute the presence of African–American jurors in criminal cases that, before the merger, would have been tried in the Recorder's Court. Indeed, plaintiffs acknowledge that African–American judges are a principal object of the legislation in asserting that "the impetus for the abolition of Recorder's Court is to insure that African American judges, such as Dalton Roberson, are not allowed to make determinations in relation to crimes allegedly committed by African–Americans against white suburbanites within the City of Detroit."

In sum, plaintiffs have not established that they or their members have a sufficient personal stake in the outcome of the Wayne County Circuit Court races to have standing. Plaintiffs' argument for standing is essentially that the merger is unfair because it was motivated by a racial animus in the majority of the Michigan legislators who voted in favor of Public Act 374 of 1996, and presumably the governor who signed it. Plaintiffs' injuries are conjectural rather than concrete and particularized; it is unclear what actual harm the plaintiffs have suffered merely as registered voters residing in the City of Detroit. *See Miyazawa v. City of Cincinnati,* 45 F.3d 126, 128 (6th Cir.1995) ("Miyazawa has suffered no harm, nor will she suffer any greater harm than that of any other voter in the City of Cincinnati, that would provide her standing herein"). Plaintiffs' generalized complaint is insufficient to establish a question of fact. Because the "irreducible constitutional minimum of standing" is lacking, *Lujan,* 504 U.S. at 560, 112 S.Ct. 2130, the constitutional claims must be dismissed.

### B. Constitutional Arguments

▪ Although the Court's decision to dismiss the constitutional claims rests on plain-

tiffs' lack of standing, a brief review of the constitutional claims as plaintiffs have presented them reveals that they have serious shortcomings. In *NAACP v. Austin*, 857 F.Supp. 560 (E.D.Mich.1994), this Court stated that the "totality of the relevant facts" must be evaluated in determining whether the State intentionally discriminated against plaintiffs on the basis of race.

> This evaluation may include consideration of the following elements: (1) the impact of the official action on members of different racial groups; (2) the foreseeable effects of the action; (3) the historical background of the decision to act, including legislative or administrative history; (4) the specific sequence of events leading to the action; and (5) substantive and procedural departures from the decision-making routine.

*Id.* at 572 (citing *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266–68, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977)). To establish a discriminatory purpose in the legislation, plaintiffs must show that the merger went forward "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.* (quoting *Personnel Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979)). Such a showing "implies more than intent as volition or intent as awareness of consequences." *Id.* (quoting *Feeney*, 442 U.S. at 279, 99 S.Ct. 2282).

To be sure, plaintiffs have proffered evidence that the Michigan Legislature had notice of the potentially adverse consequences of the merger on the African–American judges of the Recorder's Court, as well as the jury pool. The historical background, however, reveals that the merger was part of a larger effort to equitably fund the state's trial courts in response to the "difficulty" created by Public Acts 438 through 442 of 1980. *See, e.g., Grand Traverse County*, 450 Mich. at 466, 538 N.W.2d 1. The merger

also corrected the anomaly existing in Wayne County, which was the only county in the state that in effect had two circuit courts. Further, plaintiffs point to nothing remarkable regarding the sequence of events leading to the merger, and there is nothing to indicate the existence of substantive and procedural departures from the decision-making routine.

A reading of the record compiled by the parties reveals that the merger went forward because of a desire to standardize and equitably fund the trial courts of the state, and only in spite of the potentially adverse effects on African Americans. Plaintiffs have not proffered any relevant evidence to indicate that the courts were merged with the adverse effects as the motivating force.[27] Accordingly, the constitutional claims as plaintiffs have presented them lack merit.

## VI. Voting Rights Act

As noted, the parties agree that the first *Gingles* precondition is satisfied because African Americans are a sufficiently large and geographically compact group to constitute a majority in a single-member district. Over ninety percent of the African Americans in Wayne County live within a legally and politically defined jurisdiction: the City of Detroit. Also, the parties apparently concede the existence of the second precondition, which essentially "asks merely whether voters of the same race tend to vote alike." *Sundquist*, 145 F.3d at 823. The Court has found that the white electorate often had markedly different voting preferences than the black electorate in the elections from 1986 to 1996. As Professor Pildes noted: "Using Dr. Brown's classifications, only one of seven minority preferred non-incumbents would have been elected among just the white electorate." It is therefore fair to state that the second precondition is satisfied for purposes of this motion.

---

**27.** In other words, there is nothing in the record to indicate that the circumstances upon passage of the legislation were any different than when, after examining aspects of the merger of Recorder's Court and Wayne County Circuit Court in 1979, the DABO stated: "[A]t no time during the many, many hours of debate and testimony from a wide range of experts on this question was any credible evidence presented, whatsoever, that would support the anti-black conspiracy theory. . . . [T]he facts to support [the antiblack conspiracy theory] were never disclosed—though we zealously sought them[.]"

The parties dispute whether the third precondition is satisfied. To defeat defendant's motion, plaintiffs at a minimum must establish a question of fact regarding whether "the white majority votes sufficiently as a bloc to enable it ... usually to defeat the minority's preferred candidate." *Gingles,* 478 U.S. at 51, 106 S.Ct. 2752. "Racial bloc" or "racially polarized" voting "exists where there is 'a consistent relationship between [the] race of the voter and the way in which the voter votes,' or to put it differently, where 'black voters and white voters vote differently.'" *Id.* at 53 n. 21, 106 S.Ct. 2752. The Supreme Court has not expanded on what is meant by the phrase "usually to defeat the minority's preferred candidate," although in a concurring opinion, Justice O'Connor suggested that a court

> should be required to find more than simply that the minority group does not usually attain an undiluted measure of electoral success. The court must find that even substantial minority success will be highly infrequent under the challenged plan before it may conclude, on this basis alone, that the plan operates "to cancel out or minimize the voting strength of [the] racial grou[p]."

*Id.* at 99–100, 106 S.Ct. 2752 (quoting *White v. Regester,* 412 U.S. 755, 765, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973)) (O'Connor, J., concurring). Thus, there are no bright-line rules for determining whether the preferred candidates are "usually" defeated. The Court of Appeals for the Sixth Circuit has held, however, that a forty-seven percent electoral success rate for minority-preferred candidates did not satisfy the third precondition in a challenge to Cincinnati's city council elections. *See Clarke v. City of Cincinnati,* 40 F.3d 807, 814 (6th Cir.1994).

### A. Incumbent Candidates

Plaintiffs acknowledge that the third precondition is not satisfied with regard to the African–American incumbent candidates. The Court agrees with Professor Pildes that, although there was polarized voting with respect to the incumbent candidates, it was not "legally significant" so as to trigger § 2 liability. Professor Pildes stated:

[P]olarized voting in and of itself is not of ultimate legal significance. The question is whether white bloc voting is powerful enough to "normally," "generally," or "usually" defeat the minority-preferred candidates. Using Dr. Brown's ... classifications, ... every one of the minority-preferred incumbent candidates was in fact elected—11 of 11. Thus, with respect to incumbent elections, the data is quite powerful and not in any significant sense disputed that there is not *legally significant* white bloc voting, whatever the level of polarized voting patterns.

(Emphasis in original). Put another way, a "special circumstance"—incumbency—may explain the success of the incumbent candidates of choice of the African–American community. *See Gingles,* 478 U.S. at 57, 106 S.Ct. 2752. *But see Clarke,* 40 F.3d at 813 ("to qualify as a 'special' circumstance ... incumbency must play an unusually important role in the election at issue").

### B. Non-incumbent Candidates

As the Court has found, voting was polarized in the elections for the Wayne County Circuit bench. The Court also found that four of eight candidates of choice of the African–American community were successfully elected, for a success rate of fifty percent. The question here is whether this rate of success is sufficient to trigger § 2 liability. In other words, does a fifty-percent success rate establish that the white voting bloc has "usually" defeated the candidates of choice of the African–American community?

The Sixth Circuit's decision in *Clarke* is instructive. In *Clarke,* the plaintiffs challenged the city council elections for the City of Cincinnati. The nine councilmembers were elected at large, and each voter could cast one vote for up to nine individual candidates. The parties agreed that the first and second preconditions were satisfied. With regard to the third precondition, the record established that forty-seven percent of the African–American's preferred candidates were elected. With this success rate, the Sixth Circuit rejected out of hand the plaintiffs' argument that the third precondition was satisfied:

This [forty-seven percent] success rate gives us no reason to find that blacks' preferred black candidates have "usually" been defeated. We therefore conclude that white bloc voting has not been targeted against blacks' preferred candidates in the city council elections[.]

*Clarke,* 40 F.3d at 812–13.

Plaintiffs have not distinguished *Clarke.* Rather, plaintiffs argue that the successes of the four victorious non-incumbent candidates from 1986 to 1996—John Murphy, Denise Page Hood, William Lucas, and Deborah Thomas—were due to "special circumstances," and thus their candidacies should be discounted in determining whether the third precondition is satisfied. In *Gingles,* the Court recognized that "the success of a minority candidate in a particular election does not necessarily prove that the district did not experience polarized voting in that election; special circumstances, such as the absence of an opponent, incumbency, or the utilization of bullet voting, may explain minority electoral success in a polarized contest." *Gingles,* 478 U.S. at 57, 106 S.Ct. 2752.[28] Although the Supreme Court has not described what and when a particular circumstance may be a "special circumstance," the Sixth Circuit has warned not to "confuse the ordinary with the special, and thus make practically every American election a special circumstance." *Clarke,* 40 F.3d at 813–14 (quoting *Collins v. City of Norfolk, Va.,* 883 F.2d 1232 (4th Cir.1989) (Chapman, J., dissenting)) (internal quotation marks omitted).

Plaintiffs' bare assertion that the successful candidacies of John Murphy, Denise Page Hood, William Lucas, and Deborah Thomas were due to "special circumstances" lacks merit. First of all, plaintiffs have buttressed this assertion only with the following unsubstantiated opinion of Dr. Brown that there were "unique circumstances" in each of the races in which they won:

When John Murphy ran in 1986 and won, he was 36th District Court judge and did not put his picture on campaign literature. Denise Page Hood ran in 1992 and won;

however, she is a member of a political family with wide Wayne County-based name recognition. Similarly, Bill Lucas had county-wide name recognition when he ran in 1996 and won; he had previously been Wayne County Sheriff, Wayne County Executive, Recorder's Court Judge and had run for Governor. Finally, Deborah Thomas ran in 1994 and won. However, Deborah Thomas' election success was an outlier. As a lawyer in private practice, Deborah Thomas ran an effective campaign under circumstances in which there were multiple non-incumbent African American candidates.[29]

But more importantly, obtaining name recognition and professional success prior to a candidacy are not "special circumstances"; they are ordinary and necessary components of a successful candidacy. Indeed, if the successful candidacies of Judges Murphy, Hood, Lucas, and Thomas were considered "special circumstances," virtually every successful candidacy would be explained by "special circumstances." *See, e.g., Clarke,* 40 F.3d at 813–14.

In sum, plaintiffs have not established a genuine issue over a material fact regarding the third *Gingles* precondition. The successes of the four non-incumbent candidates were not due to "special circumstances," and hence the Court must reject plaintiffs' invitation to discount their candidacies in determining whether plaintiffs have satisfied the third precondition. A fifty-percent rate of success for the candidates of choice of the African–American community does not "clearly show that black voters have enjoyed only minimal and sporadic success in electing representatives of their choice." *Gingles,* 478 U.S. at 60, 106 S.Ct. 2752. Because plaintiffs have not satisfied the third precondition, summary judgment for defendant is appropriate.

## VII. Conclusion

For the foregoing reasons, none of the plaintiffs has standing to bring the constitutional claims, and plaintiffs claim under § 2

---

**28.** "This list of special circumstances is illustrative, not exhaustive." *Gingles,* 478 U.S. at 57 n. 26, 106 S.Ct. 2752.

**29.** There is nothing in the record to support any of Dr. Brown's opinions in this regard.

of the Voting Rights Act fails because the *Gingles* preconditions have not been satisfied. It is important to point out, however, that the record in no way reflects how the merger will ultimately affect the composition of Wayne County Circuit Court. The pre-merger data gathered is relatively limited, and the analysis here turns on a fairly small number of candidates. If after a series of elections it becomes apparent that the merger enables a white voting bloc "usually" to defeat the candidates of choice of the African–American community, however, plaintiffs certainly would be entitled to bring another claim under the Voting Rights Act. Indeed, "a pattern of racial bloc voting that extends over a period of time is more probative of a claim that a district experiences legally significant polarization than are the results of a single election." *Gingles,* 478 U.S. at 57, 106 S.Ct. 2752. On the record now before the Court, however, it cannot be said that the preferred non-incumbent candidates of the African–American community for the Wayne County Circuit bench are "usually" defeated within the meaning of *Gingles* and its progeny.

Accordingly, defendant's motion for summary judgment is **GRANTED**, and this case is **DISMISSED**.

**SO ORDERED.**

## APPENDIX
### Table I
### GENERAL ELECTIONS 1986–1996
### WAYNE COUNTY CIRCUIT COURT
### BLACK CANDIDATES
### STANLEY DATA

| Election | V=Votes to Cast N=Number of Candidates | Rank Among Black Voters | Rank Among White Voters | Elected? |
|---|---|---|---|---|
| 1996: I | V=12 | | | |
| *Lucas* | N=19 | 2 | 7 | Y |
| Thomas | | 4 | 9 | Y |
| *Manning* | | 7 | 16 | N |
| *Coleman* | | 5 | 19 (last) | N |
| *Humphries* | | 16 | 17 | N |
| | | | | |
| 1996: NI | V=2 | | | |
| Hylton | N=4 | 2 | 4 (last) | N |
| | | | | |
| 1994: I | V=10 | | | |
| Stephens | N=13 | 1 | 5 | Y |
| *Thomas* | | 2 | 12 | Y |
| | | | | |
| 1994: NI | V=1 | | | |
| None | N=2 | | | |
| | | | | |
| 1992: I | V=9 | | | |
| Murphy | N=9 | 4 | 4 | Y |
| Simmons | | 2 | 9 (last) | Y |
| Morcom | | 7 | 7 | Y |
| | | | | |
| 1992: NI | V=3 | | | |
| Hood | N=6 | 1 | 6(last) | Y |
| | | | | |
| 1990: I | V=11 | | | Y |
| Turner | N=11 | 2 | 8 | Y |
| Thomas | | 7 | 7 | |
| | | | | |
| 1990: Vacancy | V=1 | | | |
| None | N=3 | | | |
| | | | | |
| 1988: I | V=11 | | | |
| Stephens | N=12 | 1 | 5 | Y |
| | | | | |
| 1986: Vacancy | V=2 | | | |
| Stephens | N=2 | 1 | 1 | Y |
| | | | | |
| 1986: I | V=9 | | | |
| Watts | N=9 | 1 | 7 | Y |
| Simmons | | 3 | 8 | Y |
| Morcom | | 7 | 9 (last) | Y |
| | | | | |
| 1986: NI | V=3 | | | |
| Murphy | N=6 | 1 | 5 | Y |

I = Incumbent ballot. NI = Non-incumbent ballot.
Note: Candidates in italics are those for whom a discrepancy exists between Dr. Brown and Dr. Stanley regarding incumbency status. Dr. Brown classifies all the candidates in italics as non-incumbents.

### Table II
### GENERAL ELECTIONS 1986–1996
### BLACK CANDIDATES
### STANLEY DATA

| | # Black Candidates Who Would Have Been Elected Among Just Black Electorate | # Black Candidates Who Would have Been Elected Among Just White Electorate | # Black Candidates Actually Elected |
|---|---|---|---|
| **1996:** | | | |
| I | 4 | 2 | 2 |
| NI | 1 | 0 | 0 |
| **1994:** | | | |
| I | 2 | 1 | 2 |
| NI | — | — | — |
| **1992:** | | | |
| I | 3* | 3* | 3* |
| NI | 1 | 0 | 1 |
| **1990:** | | | |
| I | 2* | 2* | 2* |
| V | — | 0 | — |
| **1988:** | | | |
| I | 1 | 1 | 1 |
| **1986:** | | | |
| I | 3* | 3* | 3* |
| NI | 1 | 0 | 1 |
| V | 1* | 1* | 1* |

\* = Races where # Candidates Running in General Election Equaled # Seats to be Filled

**Table III**
**TOTAL FOR ALL GENERAL ELECTIONS 1986–1996**

| | | | | |
|---|---|---|---|---|
| A) | I | 15 | 12 | 13 |
| | NI | 3 | 0 | 2 |
| | V | 1 | 1 | 1 |
| B)** | I | 7 | 4 | 5 |
| | NI | 3 | 0 | 2 |
| | V | 0 | 0 | 0 |
| C) | I | 11 | 11 | 11 |
| | NI | 7 | 1 | 4 |
| | V | 1 | 1 | 1 |

A = Based on Stanley classifications
B** = Leaving out races where V = N
C = Based on Brown classifications

**Table IV**
**PRIMARY ELECTIONS 1986, 1992, 1994**
**BLACK CANDIDATES**
**STANLEY DATA**

| Election | V=Votes to Cast N=Number of Candidates | Rank Among Black Voters | Rank Among White Voters | Succeed? |
|---|---|---|---|---|
| 1994: NI | — | | | |
| **1992: NI** | | | | |
| Hood | V=3 | 1 | 10 | Y |
| Thomas | N=12 | 2 | 7 | N |
| **1986: NI** | | | | |
| Murphy | V=3 | 1 | 9 | Y |
| Baltimore | N=17 | 2 | 17(last) | N |

## Table V
## PRIMARY ELECTIONS 1986, 1992, 1994
## AGGREGATE DATA