Helen MOORE, et al., Plaintiffs,

v.

SCHOOL REFORM BOARD OF
THE CITY OF DETROIT,
et al., Defendants.

No. 99–74438.

United States District Court,
E.D. Michigan,
Southern Division.

Oct. 25, 2000.

George Washington, Sharon McPhail, Detroit, MI, for Plaintiffs.

George Bushnell, Jerome Watson, Detroit, MI, Thomas Wheeker, Rick Mathew, Lansing, MI, for Defendants.

**OPINION AND ORDER DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT; GRANTING DEFENDANTS ADAMANY'S, SCHOOL REFORM BOARD'S, AND ARCHER'S MOTION FOR SUMMARY JUDGMENT; AND GRANTING DEFENDANT GOVERNOR ENGLER'S MOTION FOR SUMMARY JUDGMENT**

EDMUNDS, District Judge.

This matter came before the Court at a hearing on October 3, 2000, on 1) Plaintiffs' Motion for Partial Summary Judgment; 2) Defendants Adamany's, School Reform Board's, and Archer's Motion for Summary Judgment; and 3) Defendant Governor Engler's Motion for Summary Judgment. For the reasons set forth below, Plaintiffs' Motion for Partial Summary Judgment is DENIED, and Defendants' Motions for Summary Judgment are GRANTED.

## I. Facts

Plaintiffs filed this suit challenging the validity of the Michigan School Reform Act, 1999 Public Acts 10 and 23, which brought about the suspension of the old Detroit Public School Board and the creation of a new Detroit Public School Reform Board.

Plaintiffs include the following residents of the City of Detroit: Helen Moore, Agnes Aleobua, Stephen Conn, George Frazier, and Mariatu Sesay. Plaintiffs also include the following incorporated and unincorporated associations of Detroit residents: The Baptist Ministers' Conference; The Black Slate, Inc.; The Coalition to Defend Affirmative Action by Any Means Necessary; The Community Coalition for Empowerment, Inc.; The Eastside Ministers United in Action; The Keep the Vote—No Takeover Coalition; The Million Man Alumni Association; The Strike to Win Quality Education Caucus; United For Equality and Affirmative Action; and The Westside Ministers Alliance. Plaintiffs filed this suit on September 13, 1999, challenging the School Reform Act against the following Defendants: The School Reform Board, established by 1999 Public Act 10; Dr. David Adamany, former Chief Executive Officer of Detroit Public

Schools;[1] Dennis Archer, Mayor of Detroit; John Engler, Governor of Michigan.

The School Reform Act, effective March 26, 1999, amended the Revised School Code, Mich.Comp.Laws Ann. § 380.1 et seq., to establish school reform boards for qualifying school districts. Mich.Comp. Laws Ann. § 380.371–.471a. A "qualifying school district" was defined as a school district with a pupil population of 100,000 or more. Id. § 380.402. The Act provided that the mayor of any "qualifying school district" must appoint six of seven members of the school board within thirty days. Id. § 380.372(1) & (2). While a majority of the board must be composed of school electors of the qualifying school district (i.e. Detroit residents), others who are non residents may be appointed to the board as well. Id. § 380.372(3). The seventh member of the reform board is the Superintendent of Public Instruction, selected by the State Board of Education, or his designee. Id. The Act suspended the powers and duties of the existing school board, id. § 380.373(1), and disqualified the existing school board members from appointment to the new School Reform Board. Id. § 380.372(3).

Public Act 10 provided that the new School Reform Board would appoint, by unanimous vote, a Chief Executive Officer for the district. Id. § 374. However, effective May 12, 1999, Public Act 23 amended § 374, by providing that the Reform Board appoint a CEO by a ⅔ majority, instead of by a unanimous vote. The Superintendent of Public Instruction maintained a veto power over the vote to appoint the CEO. The Chief Executive Officer was empowered to exercise all of the powers and duties previously vested in the elected school board. Five years after the initial appointment of the Reform Board, the question of whether to retain the Re-

form Board and the CEO and whether to retain the authority of the mayor to appoint the board under the Act shall be placed on the ballot. Id. § 380.375.

The only school district in Michigan that currently falls under the statute's definition of a "qualifying school district" is the City of Detroit. The Legislature was aware that the Act would affect the Detroit Public Schools. Senator Dan DeGrow, who sponsored the bill, explained that the Act's purpose was to improve the education for a large number of Michigan students.

> There are approximately 180,000 students in the Detroit Public Schools. To put it in perspective, the next largest school district is Grand Rapids, which has around 27,000 students..... I hope that gives you the idea of the magnitude of what happens when children aren't provided the educational opportunity they deserve and how that has repercussions throughout the state, just because of the magnitude.

> It has been said by someone else that Detroit is not the worst school district in the state and I won't dispute that, but when you have a district with 180,000 students, and you look at the class of 1998 and see 71 percent missing in action, one has to wonder what happens. Where do those young people go? What is their future; what does this mean for the state of Michigan? ....

> We've waited a long time in this state for improvement, we've heard a lot of new plans—new plans have been coming out of there since I've been down here as a legislature (sic) since 1981. I think it is time for fundamental change—major change that will give these 180,000 thousand (sic) students the opportunity to achieve a quality education. They do

1. The School Reform Board has now appointed a new CEO, Dr. Kenneth Burnley.

not have it now and the repercussions to this state and to those students are severe.

Defendants' Exhibit D, Journal of the Senate, No. 17, March 2, 1999, at 249–50. While the Act currently only applies to the Detroit Public Schools, the Legislature has since clarified its original intent that the School Reform Act applies to any school district that qualified on the date of enactment and to any school district that may become qualified. 2000 PA 230.

Pursuant to the School Reform Act, the old Detroit school board was suspended and a new Reform Board was established. Mayor Archer appointed six members of a new school board, some of whom were non-residents of Detroit. The seventh member of the Reform Board is the Superintendent of Public Instruction, selected by the State Board of Education.

The Reform Board came about as a result of a desire to improve the Detroit Public Schools, a school system many had identified as in distress. In 1997, the old school board initiated a study of the De-. troit Public School System. The board asked New Detroit, Inc., a non-profit group whose mission is to improve the social and economic status of Detroiters, to conduct this study and to provide specific recommendations for improvement. New Detroit constituted a Review Panel, and the Panel spent hundreds of hours studying the Detroit Public Schools. In July 1997, the Review Panel issued a report. The report found serious problems with the governance, administration, management, finance, and operations of Detroit Public Schools. The report also noted that Detroit Public Schools students score poorly on achievement tests and that Detroit Public Schools suffers from a high drop out rate. The report recommended immediate and fundamental change at every level. "[There is] an immediate need for a fundamental restructuring of Detroit Public Schools' organization and for dramatic changes in the way people do their jobs at every level of the system." Defendants' Exhibit A, A Plan for Fundamental Change at 10.

To accomplish the changes contemplated by the Panel, the DPS must launch its restructuring without delay and continue the hard work consistently for years to come. Failure to take decisive action now will further erode the system's credibility and, eventually, cost it the community's faith and backing.

Id. at 3. The Review Panel recommended that the school board appoint an independent implementation team to act swiftly. "[T]he Panel feels strongly that significant and necessary changes must occur over the next year." Id. at 30.

The old schoolboard formed an Implementation Team to institute the Panel's recommended changes, changes directed toward the goal of ensuring financial integrity and increasing student achievement. While some progress was made, it was slow and difficult. "[W]ork on the six first year objectives remains uncompleted." Defendants' Exhibit B, Implementation Team's First Year Report at 1. The Implementation Team noted that the school board needed to accelerate the pace of change and to be an aggressive advocate of the needed reforms. Id. at 1–2, 23. It was under these circumstances that the Legislature determined that the pace of change was too slow and it passed the School Reform Act to establish the new School Reform Board.

In May of 1999, the Reform Board appointed Dr. David Adamany as CEO. Pursuant to the Act, within ninety days after his appointment, Adamany was required to develop a school district improvement plan, detailing academic, financial, capital, and operational strategies, goals, and

benchmarks. In July of 1999, Dr. Adamany presented a Preliminary School Improvement Plan to the Reform Board. Defendants' Exhibit E, Preliminary Plan. The Preliminary Plan, like the New Detroit Review Panel, indicated that Detroit Public Schools was in deep distress. It noted that Detroit students are graduating at two-thirds the rate of other Michigan students, and that eleventh graders are over 27% behind the state average in reading and writing, over 41% behind in math, and over 38% behind in science. The Plan indicated that none of the Detroit Public Schools fiscal or administrative operations met acceptable standards and that Detroit Public Schools facilities are deteriorated and outdated. *Id.,* Preliminary Plan at 3–5. Like the State Legislature, Dr. Adamany noted in the Plan that the distress of the Detroit Public School District, the largest district in the State, has an enormous impact on the State as a whole.

> The distress of the Detroit Public Schools is no small matter. Its greatest impact falls on the 180,000 young people who study in the district. But it also affects the future of the City: if Detroit is to prosper, it must have an educated work force; if it is to have vibrant self government, it must have an educated citizenry. The distress of the Detroit Public Schools spreads well beyond the district's borders because of Detroit's size and centrality.... As every metropolitan region in America is discovering, its future is tied inextricably to its central city.

*Id.,* Preliminary Plan at 7. The Preliminary Plan proposed guidelines for changes and estimated the costs of such change.

The statute provides that the CEO report annually on the school improvement plan. Mich.Comp.Laws Ann. § 380.373(7). In June of 2000, Dr. Adamany issued the first annual report. Defendants' Exhibit L, Report. The report indicated that Adamany and the Reform Board instituted numerous changes. For example, the Reform Board spent an unprecedented $79 million in the summer of 1999 to repair school buildings. *Id.* at 5. The Board aggressively recruited and hired over 700 new teachers, *id.* at 6, and implemented a program to reduce class size in grades one through three from a student teacher ratio of 30 to 1 to 17 to 1. *Id.* at 10. The Report also indicated that while Detroit voters approved the issuance of a $1.5 billion bond in 1994, the old school board failed to use its authority to do so. "Indeed, a review of the use of the bonding authority approved in 1994 reveals a record of poor planning, incompetence, and waste." *Id.* at 23. Thus, Dr. Adamany and the Reform Board developed a seven year plan for the school bond program, calling for renovation of 50 buildings and construction of 69 new schools. *Id.* at 22–25. Dr. Adamany's term as CEO ended June 30, 2000, and the Reform Board appointed a new CEO, Dr. Kenneth Burnley, effective July 1, 2000.

Plaintiffs' First Amended Complaint alleges that Public Acts 10 and 23, which constitute the School Reform Act, are unconstitutional on their face and as applied under the Michigan and U.S. Constitutions,[2] and that they violate the Voting Rights Act. The First Amended Complaint sets forth the following allegations:

> Count I—The Public Acts violate the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, and they violate the Equal Protection Clause of the Michi-

---

**2.** Plaintiffs' claims of violations of the U.S. Constitution under Counts I, II, IV, VI, and VII fall under 42 U.S.C. § 1983.

gan Constitution, Mich. Const.1963, Art. 1, § 2. Plaintiffs allege that the Public Acts invidiously discriminate against Detroit residents by denying them the fundamental right to vote for their local school board.

Count II—The Public Acts violate the Equal Protection Clause of the Fourteenth Amendment because they declare members of the prior elected school board to be ineligible for appointment to the Reform Board.

Count III—The Public Acts violate section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973, because they deny and abridge the right to vote on account of race, as the City of Detroit is the only city affected by the Acts and the City of Detroit is over 70% black.

Count IV—The Acts violate the Fourteenth and Fifteenth Amendments because the Acts deprive citizens their right to vote on account of their race. This Count also alleges that the Defendants conspired to violate voting rights, in violation of 42 U.S.C. § 1985(3).

Count V—The Defendants enacted the Public Acts in violation of the Michigan Constitution's local acts provision, Art. 4, § 29. Under this provision, the legislature may not pass any local or special act unless approved by two-thirds vote of the legislature and approved by a majority of electors.

Count VI—The Local Acts deprive citizens of the right to vote in violation of the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution and in violation of the Due Process Clause of the 1963 Michigan Constitution, Art. 1, § 17.

Count VII—Public Act 23 retaliated against Marvis Cofield for the exercise of his First Amendment rights by eliminating his right to veto the Reform Board's appointment of a CEO.

Plaintiffs' Motion for Summary Judgment includes additional First Amendment claims. In their motion, Plaintiffs allege that the School Reform Act violated the First Amendment by "penalizing Detroit for its opposition to the plans of the Governor and the Mayor" and "by permanently disqualifying from appointment to the School Reform Board persons who had been elected by the citizens of the City of Detroit." Plaintiffs' Motion for Partial Summary Judgment and Answer to Defendants' Motion for Summary Judgment, p. 1 [hereinafter cited as Plaintiffs' Motion for Summary Judgment].

Plaintiffs' Motion for Summary Judgment also includes a claim that the School Reform Act violates Article 7 Section 22 of the Michigan Constitution (the Home Rule section) because it allegedly amends the Detroit City charter without a vote of the citizens of Detroit. Plaintiffs' Motion for Summary Judgment, p. 20.

The First Amended Complaint seeks preliminary and permanent injunctive and declaratory relief by asking that the Court:

a) declare 1999 PA 10 unconstitutional;

b) restrain the Reform Board and its CEO from exercising authority under the Act;

c) restrain the Mayor of the City of Detroit from appointing any further members of the school board;

d) restrain the Governor of the State of Michigan from sponsoring further legislation to deny Detroit citizens the right to vote for their school board;

e) reinstate an elected school board;

f) grant attorney fees and costs and "further relief as is just and equitable."

Now, Plaintiffs have filed a Motion for Partial Summary Judgment. Plaintiffs contend that they are entitled to judgment as a matter of law on their claims under

the Michigan Constitution's Local Acts provision, the Voting Rights Act, and the First Amendment. They contend that there are issues of fact regarding whether the School Reform Act violates the Fourteenth and Fifteenth Amendments. Defendants Adamany, School Reform Board, and Archer have filed a Motion for Summary Judgment, and Defendant Governor Engler filed a separate Motion for Summary Judgment arguing that all of Plaintiffs' claims fail as a matter of law.

## II. Standard of Review

Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. 317, 323, 106 S.Ct. 2548. Once the movant meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Summary judgment is appropriate even where state of mind is an issue; the non-movant may not defeat a motion by merely asserting that a jury might disbelieve the movant's denial. To demonstrate a genuine issue, the non-movant must present sufficient evidence upon which a jury could reasonably find for the non-movant; a "scintilla of evidence" is insufficient. *Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. 2505.

## III. Analysis

### A. Nonjusticiable Political Question

Defendants Adamany, Archer, and the Reform Board argue that this Court lacks jurisdiction over this matter because the issues Plaintiffs raise are nonjusticiable political questions. No other party has briefed this issue. Defendants argue that the issue of "which method of reform is best for the Detroit Public Schools" is an issue of public policy best left to the Michigan Legislature.

 A case presents a nonjusticiable political question when one of the following circumstances is present:

1) a textually demonstrable constitutional commitment of the issue to a coordinate political department;

2) a lack of judicially discoverable and manageable standards for resolving it;

3) the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion;

4) the impossibility of a court's undertaking independent resolution without expressing lack of respect due coordinate branches of government;

5) an usual need for unquestioning adherence to a political decision already made; or

6) the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*U.S. v. Newman*, 889 F.2d 88, 96 (6th Cir.1989) (quoting *Baker v. Carr*, 369 U.S.

186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)).

■ Defendants claim that this case meets the test because: 1) the Michigan Constitution charges the Legislature with the duty to maintain public education; 2) courts are not in the business of making policy decision regarding education; and 3) an injunction against the School Reform Act would negate the legislative process. Defendants argue that the Court should not make policy decisions regarding the path of school reform in Michigan because this is a decision that properly lies with the State Legislature; it is a nonjusticiable political question.

Defendants' argument is without merit because it is premised upon an erroneous characterization of Plaintiffs' claim. Plaintiffs have not asked this Court to make any policy decisions regarding education. Plaintiffs do not ask this Court to choose between various methods or paths of reform. Instead, Plaintiffs raise various constitutional challenges to the School Reform Act. Courts are commonly called upon to make these types of decisions, and the Court's jurisdiction here is not barred by the political question doctrine.

## B. Michigan Constitution's Local Acts Provision

■ Plaintiffs contend that the School Reform Act was passed without a two-thirds vote and a referendum vote in violation of the Michigan Constitution's local acts provision, Art. 4, § 29. Article 4, section 29 provides specifically:

The legislature shall pass no local or special act in any case where a general act can be made applicable, and whether a general act can be made applicable shall be a judicial question. No local or special act shall take effect until approved by two-thirds of the members elected to and serving in each house and

by the majority of the electors voting thereon in the district affected. Any act repealing local or special acts shall require only a majority of the members elected to and serving in each house and shall not require submission to the electors of such district.

The local acts provision was made part of the Michigan Constitution in order to avoid state legislation which interfered with purely local matters and to avoid faulty judgment exercised by state legislators whose districts would have no interest in the local act.

In the first place much of the legislation thus enacted [i.e. local acts] constituted a direct and unwarranted interference in purely local affairs and an invasion of the principles of local self-government. In the second place, such legislation affecting as it did certain limited localities in the state, the Senators and Representatives from unaffected districts were usually complaisant, and agreed to its enactment without the exercise of that intelligence and judgment which all legislation is entitled to receive from all the members of the Legislature.

*Attorney General v. Lacy,* 180 Mich. 329, 146 N.W. 871, 874 (1914). Plaintiffs assert that the Act is local legislation that was not approved by two-thirds vote of the legislature and by a majority of electors.

Plaintiffs' claim is without merit, as the School Reform Act is not "local" legislation for two reasons: 1) the Legislature retains authority over school districts and 2) the Act is not directed to a single city, but instead applies to all school districts based on their population.

The Michigan Constitution requires that the State Legislature encourage education and maintain and support public elementary and secondary schools. Mich. Const. Art. 8, §§ 1 & 2. Supervision over all

public education is vested in a state board of education. Mich. Const. Art. 8, § 3. Courts have interpreted these provisions of the Michigan Constitution broadly, and have held that the Michigan Legislature is vested with control over public school systems in this State.

Unlike the delegation of other powers by the legislature to local governments, education is not inherently a part of the local self-government of a municipality except insofar as the legislature may choose to make it such. *Control of our public school system is a State matter delegated and lodged in the State legislature by the Constitution.* The policy of the State has been to retain control of its school system, to be administered throughout the State under State laws by local State agencies organized with plenary powers to carry out the delegated functions given it by the legislature.

*Lansing School Dist. v. State Bd. of Educ.,* 367 Mich. 591, 116 N.W.2d 866, 868 (1962) (emphasis added). "It is axiomatic that, under the laws of this State, school matters are subject to the control of the legislature and are matters of State concern." *School Dist. No. One Fractional v. School Dist. No. Two Fractional,* 340 Mich. 678, 66 N.W.2d 72, 73 (1954).

In fact, the Michigan Supreme Court long ago established that school districts are state agencies. *Attorney General v. Lowrey,* 131 Mich. 639, 92 N.W. 289, 290 (1902). School districts do not exist except as provided by the State; they have no functions, rights, or powers except as provided by the State. *East Jackson Public Schools v. State,* 133 Mich.App. 132, 348 N.W.2d 303, 306 (1984). *See also Bradley v. Milliken,* 484 F.2d 215, 246 (6th Cir. 1973) (public school system is State function and school districts are instrumentalities of State created for administrative purposes), *reversed on other grounds,* 418

U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974). "Education is not part of the local self-government inherent in the township or municipality except so far as the Legislature may choose to make it such." *Jones v. Grand Ledge Public Schools,* 349 Mich. 1, 84 N.W.2d 327, 329 (1957) (quoting *MacQueen v. Port Huron City Comm'n,* 194 Mich. 328, 160 N.W. 627 (1916)).

Moreover, the selection of school officials is within the discretion of the State Legislature. *Penn School Dist. No. 7 v. Board of Educ. of Lewis–Cass Intermed. School Dist.,* 14 Mich.App. 109, 165 N.W.2d 464, 472 (1968). In *Penn School District,* plaintiffs sought to enjoin a local board of education from conducting a school district reorganization pursuant to a state statute permitting the reorganization. The complaint alleged that the statute was unconstitutional because the method of selecting committees charged with the reorganization was improper. The court upheld the statute explaining, "The authority granted by the constitution to the legislature to establish a common or primary school system carried with it the authority to prescribe what officers should be chosen to conduct the affairs of the school-districts (sic), to define their powers and duties, their term of office, and how and by whom they should be chosen." *Id.,* 165 N.W.2d at 473 (quoting *Belles v. Burr,* 76 Mich. 1, 43 N.W. 24, 26 (1889)).

Plaintiffs argue that the School Reform Act is local legislation, relying on the broad language in *Common Council of City of Detroit v. Engel,* 202 Mich. 536, 168 N.W. 462 (1918). In *Engel,* the plaintiff, Council of Detroit sought a writ of mandamus to compel the defendant, the city controller, to perform his official duty and prepare and transmit school bonds bearing an interest rate of more than 4%. The city controller refused to prepare the bonds because a state statute limited the interest

rates on Detroit school bonds to no more than 4%. The plaintiff contended that the statute limiting the interest rate was invalid because it was passed in violation of the local acts provision of the Michigan Constitution. The court held that the statute was an unconstitutional local act, as it explicitly applied only to the City of Detroit. The court found that even though the state has broad powers to control education, it is not exempt from the limits of the local acts provision of the state constitution.

Defendants contend that *Engel* has been impliedly overruled by the more recent Michigan Supreme Court decision in *Hart v. County of Wayne*, 396 Mich. 259, 240 N.W.2d 697 (1976). While this Court does not read *Hart* as overruling *Engel*, *Hart* did distinguish and limit *Engel* and the Court finds that the *Hart* case is more closely analogous to the case at hand. The plaintiff in *Hart* claimed that a state statute requiring counties to supplement the salaries of state court judges who sat in those counties violated the local acts provision of the Michigan Constitution. In that case, a county resident and taxpayer objected to the statute and sought to enjoin Wayne County from supplementing the salaries of Detroit Recorder's Court judges. While Detroit voters approved the statute by referendum, the law was not put to a referendum vote by Wayne County voters. *Id.*, 240 N.W.2d at 699. The court rejected the argument that the statute violated the local acts provision. The court refused to apply *Engel* because in *Engel* the statute was expressly directed toward a specific locality, namely Detroit. The statute at issue in *Hart* applied generally, as it provided that all counties must supplement the salaries of state court judges.

The *Hart* court reasoned that the state legislature had the power to establish and fund municipal courts and that the Record-er's Court was a state court which performed a state function. *Id.* at 702. Further, the court reasoned that because the Michigan Constitution gave the legislature the power to establish the courts, the legislature should also be able to modify the courts without a referendum. *Id.* at 703.

The court in *Hart* also emphasized that the funding of the judiciary was a "unique situation presenting overriding state concerns." *Id.* at 701. The court relied on other cases upholding legislation in the face of a local acts challenge due to the fact that the matter was an area of state concern. *See e.g., City of Ecorse v. Peoples Community Hosp. Authority*, 336 Mich. 490, 58 N.W.2d 159 (1953) (upholding statute allowing creation of authorities to create hospitals because health is matter of statewide concern); *People v. De Meaux*, 194 Mich. 18, 160 N.W. 634 (1916) (upholding statute authorizing judge from one district to substitute in another district because judges administer justice on behalf of the State, not on behalf of a locality; rejecting claim that citizens of district have right to vote for judges in their district). Education, like supervision of the courts, is also a matter of state-wide concern. *Lansing*, 116 N.W.2d at 868.

*Hart* applies here. When the State Legislature passed the School Reform Act, it did not pass local legislation. The Act does not apply only to one locality like the statute did in *Engel*. It applies to all "qualifying" school districts, districts of at least 100,000 students. While the Act currently only applies to the Detroit Public Schools, by its terms it will automatically apply to any school district that may hereafter become qualified. 2000 PA 230. The Michigan Legislature has the power to encourage, maintain, and support public education, and a school district is a creation of and an agency of the State. In other words, when it enacted the School

Reform Act, the Michigan Legislature merely exercised appropriate state authority over a state agency, a school district. Moreover, the supervision over and improvement of the largest school district in the State is a matter of overriding state concern. Both the State Legislature and Dr. Adamany emphasized that the distress suffered by the Detroit Public Schools has a tremendous impact on the State. "The distress of the Detroit Public Schools spreads well beyond the district's borders because of Detroit's size and centrality." Defendants' Exhibit E, Preliminary Plan at 7.

Plaintiffs also argue that the School Reform statute, as originally enacted, applied only to Detroit and thus was invalid local legislation. Plaintiff points out that the Act referred to "*the* qualifying school district." 1999 PA 10 § 373(6). Also, the Act provided one time limit for mayoral appointments to the school reform board by providing, "not later than thirty days ... the mayor shall appoint a school reform board...." 1999 PA 10 § 372(1). Plaintiff contends that this case is analogous to *Mulloy v. Wayne County Board of Supervisors*, 246 Mich. 632, 225 N.W. 615 (1929), which struck down as an unconstitutional local act a statute that permitted Wayne County to appoint a civil service commission. While the statute in *Mulloy* applied to counties of 300,000 or more, it specifically referred to *the* county and clearly meant only Wayne County. The Mulloy court held that a statute which by its terms applied only to one county created a closed class and was a prohibited local act.

The fact that a statute contains a population classification which limits its application does not necessarily make the act a local act. Here the State Legislature passed an amendment that amended the School Reform Act to clarify the Legislature's original intent that the Act apply to any school district that qualified on the date of enactment and to any school district that hereafter may become qualified. 2000 PA 230. Public Act 230 provides:

The amendments made by the amendatory act ... are intended to reaffirm the legislature's initial intent to apply those sections and part 5a and sections 449 and 471a of the revised school code ... to any school district that was a qualifying school district under part 5a of the revised school code at the time of enactment of 1999 PA 10 *or that may hereafter become a qualifying school district.*

*Id.* (emphasis added). While the School Reform Act at the moment applies only to Detroit because currently Detroit is the only school district in Michigan with at least 100,000 students, the statute defines "qualifying school district" in a permissible open-ended manner. The Act will become applicable to other school districts as they gain population. *Mulloy* does not apply because there the statute applied to a closed-class; it did not apply to other counties as they grew.

■ Further, Plaintiffs' argument that the Court should evaluate their claim based on the statute as it was first enacted, without considering the 2000 amendment, is unavailing. Statutory amendments which merely confirm existing rights and do not take away vested rights may be applied retroactively. *Hansen–Snyder Co. v. General Motors Corp.*, 371 Mich. 480, 124 N.W.2d 286, 288 (1963). *See Stott v. Stott Realty Co.*, 288 Mich. 35, 284 N.W. 635, 640 (1939) (curative statutes which do not impair vested rights may authorize prior legitimate exercise of power). Further, an amendment of a statute is not a legislative acknowledgment that the statute is invalid; it is a common practice to amend a statute to clarify the law. *U.S. v. Tapert*, 625 F.2d 111, 121 (6th Cir.1980).

Plaintiffs also contend that a classification by population cannot be sustained where the classification does not have a reasonable relationship to the subject matter of the legislation. *Attorney General v. Lacy,* 180 Mich. 329, 146 N.W. 871, 874 (1914). In *Lacy,* the court held that an act imposing special domestic relations and juvenile laws on counties above a certain size was unconstitutional because there was no reason why residents of a large county, in that case Wayne County, should be subject to domestic relations rules that were different from those applicable to residents of other counties.

In contrast, in *Lucas v. Board of County Road Commissioners,* 131 Mich.App. 642, 348 N.W.2d 660 (1984), the court held that a statute that applied only to Wayne County was not a prohibited local act. The statute authorized the county executive to appoint road commissioners in counties having a population of at least 1.5 million. The court found that the population classification was reasonably related to the subject matter of the statute because more populated areas "present problems of governmental management and control different in kind, quality and magnitude" from those faced by less populated areas. *Id.,* 348 N.W.2d at 666. *Accord Ace Tex Corp. v. City of Detroit,* 185 Mich.App. 609, 463 N.W.2d 166, 170 (1990) (court upheld legislation authorizing cities of one million or more to collect utility user taxes to fund the hiring and training of police because major metropolitan areas have greater problems preserving public peace). "Once the validity of a population factor is recognized, the Legislature's choice as to where to draw the line, unless patently arbitrary, must be upheld...." *Lucas,* 348 N.W.2d at 666.[3]

Courts have recognized expressly that school districts of different sizes present different management issues. *MacQueen v. City Commission of Port Huron,* 194 Mich. 328, 160 N.W. 627 (1916) (legislation that provided school districts the authority to borrow money and issue bonds based on their size was upheld). *See also Hearne v. Board of Education,* 185 F.3d 770, 775 (7th Cir.1999) (legislature had rational basis for enacting legislation that changed bargaining rights of Chicago school employees because of large scale of Chicago school operations compared to other districts).

The population qualification set forth in the School Reform Act is rationally related to the subject matter of the legislation. Approximately 10% of Michigan's students are educated in the Detroit school district. While other school districts also have problems with graduation rates, test scores, and finances, the problems faced by a school district having 100,000 or more students are different in quality and magnitude from those faced by smaller school districts. In sum, the School Reform Act is not a prohibited local act; thus, Plaintiffs' claim that the Act violates the Article 4 section 29 of the Michigan Constitution must be dismissed.[4]

**3.** It should also be noted that even before the passage of the School Reform Act, the Michigan Legislature classified school districts based on size. Prior to the passage of the School Reform Act, there were two classifications of schools, general powers school districts and first class school districts. Mich. Comp.Laws Ann. § 380.11. First class districts were those of 120,000 students or more, Mich.Comp.Laws Ann. § 380.402, and thus Detroit was the only first class school district in the state. 1999 PA 10 amended the Revised School Code by lowering the enrollment districts defined as first class to 100,000 students and by creating a the School Reform Board discussed above.

**4.** Plaintiffs frame part of their argument regarding the Michigan Constitution's local acts provision as a right to vote issue by asking, "how is size related to the exercise of the right to vote?" Plaintiffs' Motion for Sum-

### C. Michigan Constitution's Home Rule Provision

■ Plaintiffs claim that the School Reform Act violates Article 7 Section 22 of the Michigan Constitution, the home rule provision, because it allegedly amends the Detroit City Charter without a vote of the citizens of Detroit. Plaintiffs reason that the current Detroit City Charter empowers the mayor with authority over various city departments but grants no authority over education, and that the School Reform Act's grant of mayoral power to appoint school board members effectively amended the charter without the requisite vote by citizens of Detroit.

Section 22 of Article 7 provides that the electors of each city "shall have the power and authority to frame, adopt and amend its charter, and to amend an existing charter of the city." The School Reform Act does not amend the charter because the charter does not contain any provisions which govern the schools. As explained above, the schools are governed by the State.

Further, the home rule provision itself expressly recognizes that the power of the city is subject to the general laws of the State Legislature. "Each such city and village shall have the power to adopt resolutions and ordinances relating to its municipal concerns, property and government, *subject to the constitution and the law.*" Mich. Const. Art. 7, § 22. Thus, even if the terms of the School Reform Act directly conflicted with the Detroit City Charter, the Act would prevail because city charters are subject to the general laws of the State. *Kalamazoo v. Titus,* 208 Mich. 252, 175 N.W. 480 (1919).

### D. Voting Rights Act

■ Plaintiffs also allege that the School Reform Act violates section 2 of the Voting Rights Act by denying the citizens of Detroit the right to vote for members of the school board. The Voting Rights Act provides, "No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 42 U.S.C. § 1973(a).

Plaintiffs' claim under the Voting Rights Act is meritless. The Sixth Circuit recently upheld similar legislation in the face of a Voting Rights Act challenge in *Mixon v. Ohio,* 193 F.3d 389 (6th Cir.1999). In that case, the state legislature had passed a statute allowing the mayor of Cleveland to appoint a new school board. The court held that section 2 of the Voting Rights Act applies only to elective, not to appointive processes, and thus the Voting Rights Act did not apply to appointed school board members. Further, the Supreme Court has held that a state can avoid application of the Voting Rights Act by changing from an elective to an appointive process. *Chisom v. Roemer,* 501 U.S. 380, 401, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991). *See Sailors v. Kent Board of Educ.,* 387 U.S. 105, 110–11, 87 S.Ct. 1549, 18 L.Ed.2d 650 (1967) (no constitutional reason why officers of nonlegislative character may not be chosen by governor, legislature, or some other appointive process rather than by election).

Plaintiffs argue that "*Mixon* is irrelevant because the Ohio legislation at issue in that case did not subject the appointed board imposed upon Cleveland to a veto by an official responsible to a statewide electorate." Plaintiffs do not elaborate upon this argument, and thus they do not

mary Judgment, p. 19. The right to vote issue is addressed *infra.*

explain why the State Superintendent's veto power over the appointed board's choice of CEO is relevant to Plaintiffs' voting rights claim. The fact is that *Mixon* is directly on point and its holding applies to this case. Section 2 of the Voting Rights Act does not apply to appointive processes, and, under *Chisom*, the State Legislature is free to change the process from an elective process to an appointive process.

Plaintiffs erroneously argue that *Allen v. Board of Elections*, 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969) applies. In *Allen*, the Supreme Court found that a change in the Mississippi Code which called for the appointment instead of the election of the superintendent of education had to be scrutinized to determine if it complied with section 5 of the Voting Rights Act. Section 5 applies only to states with a record of voting discrimination, and it requires preclearance of proposed changes in election procedures that affect voting rights. *Mixon*, 193 F.3d at 407. Section 5 does not apply to Michigan, 28 C.F.R. § 51.4, and thus, neither does *Allen*.

Plaintiffs finally argue that section 2 of the voting rights act is broader than section 5, relying on *Reno v. Bossier Parish School Board II*, 528 U.S. 320, 120 S.Ct. 866, 145 L.Ed.2d 845 (2000). There, the Supreme Court held that an at large voting system for school board was not subject to preclearance under section 5 of the Voting Rights Act because neither its purpose nor its effect was to discriminate against black voters. However, the Court noted:

[Preclearance] does not represent approval of the voting change; it is nothing more than a determination that the voting change is no more dilutive [of black votes] than what it replaces, and therefore cannot be stopped in advance under the extraordinary burden-shifting procedures of Section 5, but must be attacked through the normal means of a Section 2 action.

528 U.S. at 335, 120 S.Ct. at 875.

*Reno* is inapposite. It dealt with redistricting and the issue of vote dilution under section 5. It did not address the issue of legislation replacing an elective system with an appointive system. The *Reno* court itself recognized, "[O]ur holding today does not extend to violations consisting of an outright 'denial' of an individual's right to vote, as opposed to an 'abridgement' as in dilution cases." 528 U.S. at 338 n. 6, 120 S.Ct. at 877 n. 6.

### E. Equal Protection

 Plaintiffs next contend that the School Reform Act violates their right to equal protection under the Fourteenth Amendment and the equal protection clause of the Michigan Constitution.[5] Classifications that involve a fundamental right or a suspect class must pass the strict scrutiny test and such classifications are upheld only if they are necessary to promote a compelling government purpose. Classifications that do not involve a fundamental right or a suspect class are subject to a rational basis test. Under that test, it is permissible to treat classes of persons differently if the legislation is rationally related to a legitimate state pur-

**5.** The Fourteenth Amendment to the U.S. Constitution provides, "No State shall ... deny to any person within its jurisdiction the equal protection of the laws." The Michigan Constitution, Article 1, Section 2, similarly provides:

No person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin.

pose. *Mixon,* 193 F.3d at 402. *Anderson v. City of Detroit,* 54 Mich.App. 496, 221 N.W.2d 168 (1974) (absent suspect class or involvement of fundamental right, statute only needs rational basis to be upheld in face of equal protection challenge under Michigan Constitution). Plaintiffs assert that the Court should apply strict scrutiny and should find that the School Reform Act violates their right to equal protection because:

1) the statute denies Detroit voters the "fundamental" right to vote for their school board;

2) the statute prohibits former school board members from serving on the board, and thus deprives Plaintiffs of their "fundamental" right to retain their elected representatives; and

3) the statute deprives Plaintiffs of the right to vote on account of their race.

■ Contrary to Plaintiffs' assertion, there is no fundamental right to vote for members of a school board. The Sixth Circuit flatly rejected a claim identical to Plaintiffs' claim in *Mixon.* "[T]here is no fundamental right to elect an administrative body such as a school board, even if other cities in the state may do so." 193 F.3d at 403. *Accord Lansing School Dist. v. State Bd. of Educ.,* 367 Mich. 591, 116 N.W.2d 866 (1962) (legislature did not give right to vote on annexation of territory to school district, thus no violation of equal protection to deny one district right to vote on annexation).

■ Just as there is no fundamental right to vote for members of a school board, there is no fundamental right to retain an elected official. Where offices are created by statute, the Legislature may abolish the offices even during an incumbent's term. *MacDonald v. DeWaele,* 263 Mich. 233, 248 N.W. 605, 606 (1933). The office of the old school board members was created by statute, by the

Michigan Revised School Code. Mich. Comp.Laws Ann. § 380.401 et seq. Thus, the Michigan Legislature had the authority to modify or abolish the old school board.

■ Plaintiffs also assert that the School Reform Act violates their right to equal protection because it deprives them of the right to vote due to their race. To make out such a claim and to survive summary judgment, Plaintiffs must bring forth some evidence of a racially discriminatory intent or purpose. *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 265, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). "When a facially neutral rule is challenged on equal protection grounds, the plaintiff must show that the rule was promulgated or reaffirmed *because of,* not merely in spite of, its adverse impact on persons in plaintiff's class." *Horner v. Kentucky High School Athletic Ass'n,* 43 F.3d 265, 276 (6th Cir.1994) (emphasis in original). "The type of impact sufficient in itself to prove intentional discrimination is that which is significant, stark, and unexplainable on other grounds." *Id.* at 276. Absent a showing of arbitrariness or irrationality, to determine whether invidious race discrimination was a motivating factor demands an inquiry into circumstantial and direct evidence of intent including: 1) the impact of the official action; 2) the historical background of the official action; 3) the specific sequence of events leading up to the challenged decision; 4) any procedural or substantive departures from the norm in connection with the official action; and 5) the legislative history of the official action. *Arlington Heights,* 429 U.S. at 266–67, 97 S.Ct. 555.

The Seventh Circuit recently rejected an equal protection challenge to school reform in Chicago. In *Hearne v. Board of Educ.*

*of City of Chicago,* 185 F.3d 770 (7th Cir. 1999), school district employees challenged legislation restricting their bargaining rights, claiming that the legislation had a racially disparate impact. The court dismissed their equal protection claim, noting that there are substantial numbers of African–Americans in many other Illinois cities and "it is simply too great a stretch to say that the population represented by the Chicago school system is such a good proxy for African Americans that the ostensibly neutral classification is 'an obvious pretext for discrimination.' " 185 F.3d at 775–76. *See also Anthony v. Michigan,* 35 F.Supp.2d 989, 1004 (E.D.Mich.1999) (rejecting equal protection challenge to merger of Detroit Recorder's Court with Wayne County Circuit Court because no evidence race was a motivating factor).

The School Reform Act is racially neutral on its face. While Plaintiffs do not argue that the history, context, or procedure by which the School Reform Act was enacted evidence racist intent, Plaintiffs do claim that the impact of the School Reform Act reveals racist intent. Plaintiffs reason that because the Act affects a school district that is predominantly African–American and the Michigan Legislature knew this when it enacted the statute, the purpose of the statute was to discriminate on account of race. However, Plaintiffs cite no evidence whatsoever of racial bias or motive. Plaintiffs merely argue that there is a correlation between high drop out rates and low test scores and poverty and race and that there are school districts with worse test scores that are unaffected by the reform legislation. Even assuming that all this is true, it simply does not follow that the School Reform Act was racially motivated.

Because Plaintiffs cite no evidence of purposeful discrimination, the rational basis test applies. Under the rational basis test, the classification must be upheld if there is any reasonably conceivable state of facts that could provide a rational basis for the classification. *FCC v. Beach Communications, Inc.,* 508 U.S. 307, 314, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993). The state does not even have to produce evidence to support the challenged legislation, as it may be supported based on "rational speculation." *Id.*

In *Mixon,* the Sixth Circuit applied the rational basis test and upheld the school district legislation that allowed Cleveland's mayor to appoint a new school board, finding "state legislatures need the freedom to experiment with different techniques to advance public education and this need to experiment alone satisfies the rational basis test." *Mixon,* 193 F.3d at 403. Further, the sheer size of the largest school district in the state supports a rational basis for the legislation. *Hearne,* 185 F.3d at 775–76 (size of Chicago school system implicated concerns different from those in other districts). Other reasons for having an appointed school board instead of an elected one include a need to insulate school boards from direct political pressures, to encourage the service of individuals who might not be willing to run for public office, and to promote diverse viewpoints that might not obtain representation on an elected board. *Irby v. Virginia State Bd. of Elections,* 889 F.2d 1352, 1355 (4th Cir.1989). Here, the legislative history reveals that the Act's purpose was to improve education for students in the largest school district in the state. "I think it is time for fundamental change—major change that will give these 180,000 thousand (sic) students the opportunity to achieve a quality education. They do not have it now and the repercussions to this state and to those students are severe." Defendants' Exhibit D, Journal of the Senate, No. 17, March 2, 1999, at 249–50 (comments of Senator DeGrow).

Plaintiffs argue that *Romer v. Evans*, 517 U.S. 620, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996), applies. In *Romer*, the Court held that the Colorado Constitution could not be amended to prohibit local government from enacting legislation to protect homosexuals. "A law declaring that it shall be more difficult for one group of citizens than for all others to seek aid from the government is itself a denial of equal protection of the laws in the most literal sense." *Id.* at 633, 116 S.Ct. 1620. The Court found no legitimate state purpose to legislation imposed on this single group of people. In contrast, here, the School Reform Act was designed to address specifically identified problems, to advance education in the largest school district in the State. *Romer* is inapposite.

In sum, because Plaintiffs do not assert a fundamental right and because they have brought forth no evidence of intentional race discrimination, the strict scrutiny test does not apply. Instead, the Court must apply the rational basis test. The need of the Michigan Legislature to experiment with different techniques to advance public education alone satisfies the rational basis test. *Mixon*, 193 F.3d at 403. Plaintiffs have failed to come forward with specific evidence showing that there is a genuine issue of fact for trial, *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348, thus their equal protection claim must be dismissed.

### F. Fifteenth Amendment

▆▆▆ Plaintiffs contend that the School Reform Act violates the Fifteenth Amendment by depriving them of the right to vote on account of their race. A statute that is racially neutral on its face violates the Fifteenth Amendment only if it is motivated by a discriminatory purpose. *Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). The School Reform Act is facially neutral, and, as explained above, Plaintiffs have failed to bring forth evidence of a discriminatory purpose. Thus, Plaintiffs' claim under the Fifteenth Amendment must be dismissed. Also, because Plaintiffs claims under the Fourteenth and Fifteenth Amendments are dismissed, their claim alleging a conspiracy to violate voting rights under 42 U.S.C. § 1985(3) also must be dismissed.

### G. First Amendment

Plaintiffs allege that the Legislature, when it enacted 1999 PA 23, retaliated against Marvis Cofield for the exercise of his First Amendment rights by eliminating his right to veto the Reform Board's appointment of a CEO. Plaintiffs allege that the Governor and Legislature changed the unanimous voting requirement in order to side step the veto of the appointment of Dr. Adamany by Mayoral appointee, Marvis Cofield. Plaintiffs allege that it was improper to remove the veto vote of Cofield, who is black, and retain the veto power of the Superintendent, who is white. Plaintiffs also allege that their First Amendment rights were violated by the old school board members' disqualification from appointment to the new Reform Board.

Plaintiffs bear the burden of proving standing, that they have suffered an injury in fact, an injury which is concrete, particularized, and actual or imminent. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). *See Anthony v. Michigan*, 35 F.Supp.2d 989, 991 (E.D.Mich.1999) (Detroit registered voters who were plaintiffs failed to set forth a concrete and particularized injury due to merger of Recorder's Court with Wayne County Circuit Court). Cofield and the former school board members are not named plaintiffs in this action and Plaintiffs do not have standing to allege a violation of their First Amendment rights.

Plaintiffs also allege that the School Reform Act violated the First Amendment by "penalizing Detroit for its opposition to the plans of the Governor and the Mayor and by permanently disqualifying persons from appointment to the School Reform Board persons who had been elected by the citizens of the City of Detroit." Plaintiffs' Motion for Summary Judgment, p. 1. As discussed above, there is no fundamental right to vote for members of an administrative body such as a school board. *Mixon,* 193 F.3d at 403. Further, there is no fundamental right to retain an elected official. *MacDonald,* 248 N.W. at 606 (legislature may abolish offices created by statute even during incumbent's term). Accordingly, Plaintiffs' First Amendment claim is hereby dismissed.

## IV. Conclusion

Being fully advised in the premises, having read the pleadings, and for the reasons explained above, the Court hereby orders as follows:

Plaintiffs' Motion for Partial Summary Judgment is DENIED.

Defendants Adamany's, School Reform Board's, and Archer's Motion for Summary Judgment is GRANTED;

Defendant Governor Engler's Motion for Summary Judgment is GRANTED.

Accordingly, this case is hereby DISMISSED.